NOT DESIGNATED FOR PUBLICATION

No. 118,156

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

ERIC VINCENT LANDEO,
*Appellant*.

MEMORANDUM OPINION

Appeal from Johnson District Court; THOMAS KELLY RYAN, judge. Opinion filed August 2, 2019. Affirmed in part, sentences vacated, and remanded for resentencing.

*Peter Maharry*, of Kansas Appellate Defender Office, for appellant, and *Eric Vincent Landeo*, appellant pro se.

*Shawn E. Minihan*, assistant district attorney, *Stephen M. Howe*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before GARDNER, P.J., GREEN and ATCHESON, JJ.

PER CURIAM:  A jury convicted Eric Vincent Landeo of one count of rape of a child under the age of 14, and one count of aggravated indecent liberties. Landeo raises six issues for our consideration. Landeo contends the following:  (1) that the trial court violated his Sixth Amendment right to counsel when it forced him to proceed pro se at sentencing; (2) that the trial court violated his constitutional speedy trial rights; (3) that the trial court erred by denying his motion to sever the charges; (4) that the trial court

erred when it allowed one of the complainants to testify about previous uncharged sexual abuse by Landeo; (5) that this court should reverse his convictions because of cumulative trial errors; and (6) that this court lacks jurisdiction over Landeo because errors in the State's charging documents deprived the trial court of subject matter jurisdiction over him. Of these six issues, this court finds only the first to be meritorious. Accordingly, this case is affirmed in part, the sentences are vacated on both counts, and the case is remanded for resentencing on both counts with directions.

In 2013, S.M., her mother B.P., her stepfather C.P., and her siblings lived in the upstairs portion of Landeo's Shawnee, Kansas, home while Landeo lived in a basement bedroom. Landeo, who co-owned the house with his brother, was the family's landlord. Landeo was about 40 years old. The children, including S.M., would often go into Landeo's bedroom in the basement to hang out with him and play video games.

On June 21, 2013, S.M. was seven years old. S.M. and her brothers went downstairs to hang out with Landeo in his bedroom. While her brothers were in a recliner facing away from Landeo's bed watching TV, S.M. lay on the bed with Landeo where she played with his phone. Then, Landeo touched S.M.'s genitals. He told her she should not tell anyone what was happening.

Landeo stopped touching S.M. when her mother, B.P., came downstairs and opened the door to Landeo's bedroom, surprising him. B.P. saw S.M. and Landeo "shuffling around in his bed" underneath a comforter. When B.P. came in the door, S.M. jumped up so that she was standing on the bed adjusting her clothing. Landeo had a "shocked" and "weird" look on his face, and his face was very sweaty.

B.P. was immediately concerned but pretended not to be so that she could get S.M. out of the bedroom. B.P. told S.M. to come upstairs with her; S.M. complied. Upstairs,

2

B.P. asked S.M. why she was in the bed with Landeo. S.M. responded that Landeo "had [her] shorts down because he was touching [her]" and that Landeo's pants were down too.

B.P. told her husband C.P. about what she saw. C.P. went downstairs to confront Landeo, but Landeo refused to speak to him. Then, C.P. spoke with S.M. S.M. used hand gestures and explained to C.P. that Landeo had touched her "on the inside" of her vaginal area.

Next, B.P. went downstairs to confront Landeo. Landeo also tried to avoid B.P., but she stopped him as he tried to go up the stairs. She convinced him to speak with her in her car. She told Landeo, "[y]ou need to explain to me why you would—what you were doing and why you would hurt this family and violate my daughter." Eventually, Landeo responded that she was "right, [he] need[ed] to get out more." This was a reference to previous conversations where Landeo, B.P., and C.P. had spoken about how Landeo should get out and date more. B.P. asked Landeo what she should do. Landeo responded that she should "just keep [Landeo and S.M.] away from each other." Next, B.P. told Landeo she was calling the police, and ran into the house to do so. When she did so, Landeo left in his car.

Police came to the house. An officer interviewed S.M. S.M. said Landeo "had pulled down her shorts and her underwear and touched her private areas and that he also had his pants down"; she used gestures to clarify that by "private areas" she meant her vaginal area. The police officer then escorted B.P. and S.M. to the hospital for a sexual assault exam. On the way to the hospital, B.P. received a text from Landeo that said, "The only thing I can do is move out I am. Sorry very sorry."

At the hospital, a Sexual Assault Nurse Examiner (SANE) performed the sexual assault exam on S.M. and collected the evidence in a "rape kit." The nurse noted that some areas of S.M.'s labia minora were red. According to the nurse, however, the redness

was not necessarily caused by an injury. The nurse took swabs from S.M.'s labia minora; those swabs later tested positive for Landeo's semen. The odds that the semen belonged to anyone other than Landeo were 1 in 19.87 quintillion.

After the sexual assault exam, S.M. spoke with a detective at the hospital. S.M. told the detective that someone touched her "in her private areas"; she again used hand gestures to indicate that by "private areas" she meant her vaginal region. That same detective tried to call Landeo that evening after interviewing S.M.; he was unable to reach Landeo but left voicemails. At 1:30 a.m. the next morning, Landeo called the detective back and had several separate phone calls with the detective. The detective recorded the calls.

Two days after the sexual assault exam, S.M. did a forensic interview at the Sunflower House.

Police arrested Landeo and the State charged him with raping S.M. After police arrested Landeo based on S.M.'s allegations, L.V. also came forward with similar allegations. L.V. is Landeo's niece.

According to L.V., Landeo started sexually abusing her around age six, when he visited her family when they lived in Texas. He showed her child pornography on his computer featuring a girl performing sex acts on a man. He asked her to perform oral sex on him, and offered to put Nesquik on his penis to make it more appealing to her. She said she did not want to touch his penis. L.V. does not remember whether he touched her while she lived in Texas.

L.V.'s family moved to Kansas when she was around eight years old. According to L.V., Landeo continued to sexually abuse her when he visited the family. He would touch her breasts and genitals underneath her clothes. When L.V. was 10 or 11, the family

4

moved again, this time to Missouri. Landeo continued to frequently visit the family, and continued to abuse L.V. in the same manner when he visited.

When L.V. was 12 years old, her family moved to Shawnee, Kansas. The family lived with Landeo in the same house later occupied by S.M. and her family. As with S.M., Landeo lived in a basement bedroom while L.V. and her family lived upstairs. The sexual abuse began to taper off as L.V. got older, but did not completely stop. One night, when L.V. was in the seventh grade, L.V. was getting ready to sleep in Landeo's bed when he put his hand down her pants and started touching her vagina. When he did so, she made an excuse to leave the room, saying that she had to go because she had school the next morning.

L.V. did not tell anyone about the abuse until she was a freshman in high school. She learned about sexual assault in a health class and realized she needed to tell someone what Landeo did, so she told her mother. Nonetheless, L.V. did not want to go to the police after she told her mother because "[i]t had already been so long since it had been done with, [she] wanted to move on." L.V. did not tell anyone until years after the abuse ended because Landeo told L.V. that if she told, she would get in trouble and could be taken away from her family.

After L.V. came forward to the police in 2013, she also did a forensic interview at Sunflower House.

The State amended its complaint against Landeo to include an alternative count of aggravated indecent liberties with a child with respect to S.M. It also added two alternative counts of aggravated indecent liberties with respect to L.V. Later, in its third amended complaint with respect to S.M., the State charged Landeo with one count of rape with an alternative count of aggravated indecent liberties; with respect to L.V., the State charged Landeo with one count of aggravated indecent liberties.

Carol Cline and Kelly Goodwin were initially appointed to represent Landeo. Cline and Goodwin filed numerous motions on Landeo's behalf; during this time Landeo also continually filed pro se motions against Cline and Goodwin's advice. On February 17, 2014, and again on March 26, 2014, Landeo wrote letters to the Johnson County District Court seeking to have Cline and Goodwin removed as his counsel. During an April 3, 2014 hearing, Landeo alleged that Cline and Goodwin provided him incompetent representation. He alleged that they failed to inform him of his rights, failed to adequately cross-examine witnesses or present evidence at the preliminary hearing, and filed an insufficient motion to dismiss. The trial court cautioned Landeo that appointing a new attorney would delay the case and affect his right to a speedy trial; the trial court asked if Landeo understood that. Landeo said he understood that his request was "going to affect the speedy trial process." The trial court granted Landeo's request and appointed Angela Keck; in doing so, the trial court cautioned Landeo:

> "But I do want you to understand the new attorney that I appoint for you, that you need to work with that attorney. It's just, you can't keep going through if you don't like what that attorney's doing. You really need to make an effort to work with the attorney, let them know your concerns, let them know what you want to do. You have a role in all of this.
> "But, also, that counsel needs to make certain tactical decisions, legal—on legal issues and presentation of the case. And that it's a little bit different when you have a court appointed attorney. I just want you to understand that."

Landeo said he understood.

During this same hearing, the State complained about Landeo's frequent pro se motions alleging things like perjury, and requested an order instructing Landeo that he could only file motions through his attorney. The trial court stated that it was a

6

"legitimate point" but declined to issue such an order and instead waited to see how Landeo's relationship with Keck would work out.

The trial court appointed Keck as Landeo's attorney, but Keck soon withdrew because of a conflict. Then the trial court appointed Zane Todd. On October 1, 2014, Landeo moved to have Todd removed and have Keck reappointed. The trial court held a hearing on this motion on November 21, 2014. Landeo complained that Todd did not come see him frequently enough and did not file certain motions that he requested. Todd said that the motions Landeo asked him to file were frivolous. He also said he did not frequently visit Landeo because Landeo imposed stringent rules on Todd, requiring Todd to "write [Landeo] a letter in advance to tell him [Todd] was coming to visit and schedule those out." The trial court asked Landeo if he wanted to represent himself. Landeo said that he did not want to, but wanted "an attorney who is actually going to work on [his] case and bring all these legal issues up."

The trial court again cautioned Landeo that "if you have an attorney, you can't be filing pro se matters at the same time. Your attorney's in charge of the legal proceedings and you need to work with your attorney. All right?" Landeo said that he understood. The trial court dismissed Todd and appointed Jason Billam and Courtney Henderson to represent Landeo. The trial court told Landeo that the time required to dismiss Todd and bring new attorneys on board was "being assessed against" him with respect to his speedy trial rights.

Billam filed his entry of appearance in the case on December 8, 2014. Within a month, Landeo moved to dismiss Billam because Billam would not file motions that Landeo wanted to file alleging that his indictment was based on "perjured testimony." Billam said that none of the motions Landeo sought had any legal merit. He said that he met with Landeo "for multiple hours over two or three visits" but that they were unable to substantively discuss the case because Landeo was hung up on minute, unimportant

details that he considered "perjury." According to Billam, after each visit, Landeo would send Billam a letter with "marching orders" including an order to provide a copy of discovery to Landeo's father. Billam said that his inability to communicate with Landeo rendered the relationship "irreconcilable."

The trial court dismissed Billam and reiterated that "if you're having an attorney appointed to represent you, that attorney makes the decisions in how to present the case, the legal issues. And at this point you've now been through—this is your fourth attorney." The trial court went on to say, "if this same issue is coming up again, then I'm going to take it that you're wanting to represent yourself and we'll have standby counsel." Once again, the trial court informed Landeo that the time associated with changing lawyers would be assessed against him with respect to his speedy trial rights.

The record is not clear about the circumstances involving Henderson's departure, but it appears her representation of Landeo ended during this time as well.

Next, the trial court appointed Mark Dupree to represent Landeo on March 6, 2015. On April 24, 2015, Dupree requested 30 more days before another motions hearing before setting the case for trial. He stated that he was not ready to set the case for trial, but thought he would be within 30 days. The trial court set a trial date of July 27, 2015. The trial court informed Landeo that, because he requested the additional time, all of the time between April 24, 2015, and July 27, 2015, would be assessed against him for speedy trial purposes.

On May 18, 2015, Landeo moved pro se to disqualify the presiding judge from the case. Then, Dupree moved to withdraw from the case. During a hearing on Dupree's motion to withdraw on June 12, 2015, Dupree stated that Landeo filed a swath of pro se motions against his advice. He also pointed out that Landeo filed a complaint with the Kansas Disciplinary Administrator's Office against him and all prior counsel, creating a

8

conflict. The trial court dismissed Dupree, stating it had "no choice" because of the conflict Landeo created. The trial court told Landeo:

"The point you have come to at this stage is having an attorney to represent you or not, representing yourself, because that's the option if you can't work with an attorney and don't—don't follow the advice of an attorney, the only choice for you to go to trial is to represent yourself."

During that same hearing, the trial court addressed Landeo's motion to disqualify the presiding judge. Landeo went on at length about a laundry list of complaints regarding the judge, his previous attorneys, the prison conditions, and even a civil suit. He alleged that he didn't "even know if [he] can really have—even get a proper hearing or fair trial even in Johnson County." The judge found that Landeo failed to establish a reasonable basis for recusal. Landeo appealed this decision to the Chief Judge. The Chief Judge later denied Landeo's appeal. The trial court assessed against Landeo all the delays caused by Dupree's recusal and Landeo's motion to dismiss the judge.

On August 11, 2015, the trial court assigned Michael Parrett to represent Landeo. On November 17, 2015, Landeo filed two subpoenas duces tecum trying to obtain copies of the State's files and Parrett's files. This created a conflict of interest between Parrett and Landeo; on November 20, 2015, Parrett moved to withdraw. On November 23, 2015, the trial court quashed Landeo's subpoena and granted Parrett's motion to withdraw. The trial court noted that Landeo was "very obviously, [going] against the advice of counsel in attempting to conduct [his] own defense." It emphasized that Landeo had already gone through five attorneys and stated: "You are only causing delay. That's all I can take from the continued same story with each one of these attorneys." The trial court continued the case until December and informed Landeo that "at that point you can tell me if you are ready to represent yourself and we'll go through what that entails." The trial court noted that "[i]t may be an exercise in futility to appoint another attorney because this repeated

9

record that you have makes it self-evident that you want to direct things." Landeo emphasized that he still wanted an attorney.

The next hearing was on December 9, 2015. At this hearing, the trial court stated it believed Landeo wanted to represent himself. It found that Landeo was unwilling to work with any attorney and all had withdrawn due to his conduct. Landeo denied that he wanted to proceed pro se. He stated that he needed legal representation and contested the trial court's conclusion that he wanted to proceed pro se. Nevertheless, the trial court told Landeo that he had "created this situation that the only way to proceed [was] by representing [himself]." Landeo reiterated that he did not want to represent himself, but he maintained that all his prior attorneys provided him with ineffective assistance of counsel. The trial court then advised Landeo of the pitfalls of proceeding without an attorney.

When the trial court asked Landeo if he understood he was charged with off-grid felonies, Landeo replied:

> "I understand that they're labeled as off-grid felonies or whatever. I don't understand the constitutional context of the validity of them.
> "I don't know what's going on. I don't understand why I'm continually being pressured and all those things, and things are being taken out of actual context. I mean, I don't know. I don't understand all the ins and outs of everything.
> "And I don't—and I object to stating that I'm not trying to work with counsel because I have been trying to work with counsel. . . ."

The trial court explained that it meant he could be imprisoned for up to 25 years without parole and Landeo responded, "No, Your Honor, I do not understand that." He later reiterated that he had a "right to assistance of counsel." Nevertheless, the trial court determined that Landeo wanted to represent himself: "[F]rom both your filings with the Court, handwritten *pro se* motions both while represented and while unrepresented, as

well as your arguments in Court that I think that you have the ability and you wish to have the right to handle this matter yourself." The court then refused to appoint new counsel and ruled that Landeo had waived his right to counsel. The court, however appointed standby counsel for Landeo.

On December 18, 2015, the trial court changed its position and appointed Carl Cornwell to represent Landeo. On May 10, 2016, Cornwell withdrew for health reasons. When Cornwell withdrew, the trial court informed Landeo that the speedy trial clock would be stayed while the trial court appointed a new attorney and while the new attorney familiarized himself or herself with the case. On May 12, 2016, the trial court appointed Scott Toth to represent Landeo.

On November 22, 2016, Toth moved to dismiss the case on constitutional speedy trial grounds. On February 22, 2017, the trial court denied this motion, noting that "the delays throughout this case are primarily by the determined and deliberate or intentional acts by Mr. Landeo. . . . He has made a deliberate effort to delay this himself as long as he can." At this same hearing, the trial court judge set a trial date of May 15, 2017.

On February 27, 2017, Landeo filed an affidavit stating that he did not consent to trial.

On March 8, 2017, the trial court held a hearing at Toth's request because Landeo continued to file items with the court pro se despite the trial court's admonitions and Toth's instruction not to do so. For example, Toth noted that Landeo's affidavit refusing to consent to trial effectively undermined all of Toth's efforts on his motion to dismiss on speedy trial grounds. Toth told the court: "I don't feel like I can effectively do the job that I want to do under constraints and parameters" imposed by Landeo. Toth asked if it might be better if he acted as standby counsel and let Landeo represent himself. Landeo stated that he was not asking to dismiss Toth as his attorney.

11

Later that same day, the trial court held an in camera hearing with just Landeo and Toth present so that Toth could give more concrete examples of his issues with Landeo. For example, Toth explained that Landeo wrote him a letter saying, "[w]hat kind of railroading are you permitting. At this point, I feel like you're sending me over the edge with no parachute. I hope you have recused to crap like this." Toth also said that Landeo accused him of colluding with the State. Landeo responded that it was "natural" for defendants to feel that judges, prosecutors, and appointed defense counsel were colluding against them. The trial court told Landeo: "Either, Mr. Toth's going to represent you or he's probably just going to be stand-by counsel. I'm not going to just have you go into Court by yourself without stand-by counsel." The trial court did not allow Toth to withdraw as counsel or shift to standby counsel.

On April 12, 2017, the trial court held a hearing on the "25 or 26" pro se motions Landeo submitted throughout the course of the case. The trial court noted Landeo's multiple motions to dismiss the charges against him. Moreover, the court found that the court lacked "any basis to dismiss one or both counts or the alternative count." With respect to Landeo's frequent allegations that witnesses committed perjury and requests for criminal investigation into alleged perjury, the trial court stated: "I do not find . . . that there is any basis that I would refer any request for an investigation of the potential for the crime of perjury."

The trial court further ruled that there was no basis to dismiss the charges for prosecutorial misconduct. The trial court denied what it construed as Landeo's motion for a bill of particulars. The trial court denied Landeo's motion to void K.S.A. 60-455 for vagueness. The trial court noted that the Chief Judge denied Landeo's request to recuse the trial court judge from the case. The trial court denied Landeo's request for a *Daubert* hearing because the only State expert was slated to testify about sexual assault examination, a "well-established" type of testimony that did not require a *Daubert v.*

*Merrell Dow Pharmaceuticals*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), hearing. The trial court held that Landeo lacked standing to challenge the searches and seizures he attacked in his motion to suppress evidence. The trial court denied Landeo's motion to declare Jessica's Law unconstitutional. Toth explained that Landeo was no longer pursuing his motion to admit evidence of past good conduct. The trial court granted Landeo's motion in limine to exclude evidence of prior arrests, but it explicitly denied the motion as it applied to evidence admissible under K.S.A. 60-455.

The case proceeded to a jury trial on May 15, 2017. Toth represented Landeo at the trial. On the first day, S.M., her mother B.P., and stepfather C.P. testified, as did the police officer who responded to B.P.'s call on June 21, 2013. A former Sunflower House forensic interviewer who interviewed both S.M. and L.V. testified as well. Toth cross-examined all of these witnesses. The State admitted as evidence video footage of S.M. and L.V.'s forensic interviews; the jury watched these videos.

On the second day of trial, L.V. testified about both the early abuse in Texas, Kansas, and Missouri, as well as the charged abuse that happened in Shawnee. Next, the State called the detective who investigated both girls' allegations. The State admitted as evidence recordings of the detective's phone calls with Landeo. The State also called the SANE who performed S.M.'s rape kit and the DNA analyst who confirmed that the semen found on S.M.'s labia minora belonged to Landeo. Once again, Toth cross-examined all the witnesses. Landeo did not testify, and the defense only offered one piece of evidence: a stipulation about Landeo's phone records.

On the third day of trial, the jury convicted Landeo on all counts: one count of rape and two counts of aggravated indecent liberties. A week after trial, Toth filed a motion for a new trial on Landeo's behalf.

In the month after trial, Landeo filed the following motions and documents pro se:

- A motion for arrest of judgment.
- An "affidavit to notice the court to immediately take action" on his motion for arrest of judgment.
- A "motion for immediate hearing to rule on defendant's arrest of judgment motion and issues raised in affidavit recently filed and/or to vacate defendant's bond."
- An "affidavit in/for/to retrial and/or dismiss and bar retrial and/or prosecute for miscondu[c]t and/or prosecute for criminal conduct."
- An "addendum to motion in/for/to arrest of judgment (pursuant to K.S.A. 22-3502) and a order entered immediately."
- A motion to dismiss the case "for lack of subject matter jurisdiction."
- A motion "to dismiss count two for statute of limitation violation(s)."
- A "second addendum to/for motion in/for/to arrest of judgment . . . and a order entered immediately."
- A "motion to dismiss or retrial for failure of the court to comply with K.S.A. 60-460(dd)."
- A "motion to dismiss for state and/or federal constitutional due process and/or notice violation(s)."

On June 20, 2017, Toth moved to withdraw, stating that Landeo had requested that he withdraw, that a "conflict of interest" had developed, and that an "[i]rreparable breakdown in communications between defendant and counsel [had] made it impossible for counsel to continue to represent defendant." The next day, Toth filed an amended motion withdrawing the conflict of interest argument.

On June 30, 2017, the trial court held a hearing on the posttrial motions and to sentence Landeo. The trial court denied Landeo's numerous pro se motions. The trial court also denied Toth's motion for a new trial.

14

Next, the trial court addressed Toth's motion to withdraw. Toth testified that after the trial, he discussed sentencing strategies with Landeo. He testified that on June 14, 2017, Landeo asked him to withdraw because Landeo had "lost confidence in [Toth's] abilities to effectively represent him." He testified that after filing his motion to withdraw, he wrote Landeo a letter stating that he would no longer work on the case, and that the court would likely either appoint Landeo new counsel or make Landeo proceed pro se at sentencing with or without standby counsel. The trial court allowed Toth to withdraw but reappointed him as standby counsel.

Then Landeo requested "a continuance and either appointment of counsel or a different standby counsel" before the court addressed sentencing. He said he "just received the copy of this PSI thing" earlier in the day. Toth said that he provided Landeo a copy of the preliminary sentencing investigation report two hours before the hearing, and that "[c]riminal history is not at issue. There is no restitution. It's, quite frankly, about the blandest presentence investigation that I've seen." The court denied Landeo's request for a continuance.

Later, Landeo again requested a continuance "of at least 60 days" so he could review the presentence investigation (PSI) report and "file the other motions pertaining to any relevant matters." The State argued against a continuance; it pointed out that "[t]he information in the PSI really has no bearing on anything in this case" because Landeo was convicted of off-grid crimes. The State also noted that Landeo had already filed six pro se posttrial motions and could have filed "something regarding sentencing," but did not do so. The trial court again denied Landeo's request for a continuance.

Landeo's PSI report showed three prior adjudications: a 1987 conviction for aggravated battery, a 1988 conviction for incest, and a 1996 conviction for disturbing the peace. Landeo disputed the aggravated battery and incest convictions. The State said the

15

court could disregard the aggravated battery and incest convictions because they were decayed and had no bearing on sentencing. The court therefore considered only Landeo's disturbing the peace conviction, but said, "It has no effect as would neither of the other cases with regard to the aspect of the convictions which are off the grid in this case."

Landeo again requested a continuance "to file a motion for departure because I need to investigate that to see what I would be allowed to put in there." The State again opposed the request, pointing out that Landeo had 44 days between conviction and sentencing to file a departure motion, and clearly had no problem submitting pro se motions. However, the State said that it would not oppose an oral motion from departure that day. Toth explained that he discussed a departure motion with Landeo before Landeo asked him to withdraw.

The trial court asked Landeo to make any departure arguments he wanted to put forward. Landeo first argued that the trial court dismissed count I (rape) at the end of the trial. The State argued and the court agreed that the court did not dismiss count I. Instead, the State asked that the trial court sentence Landeo on all three counts but set aside count II because count II was an alternative count of count I.

Next, Landeo argued that statutory off-grid sentencing was unconstitutional, reiterating a previous challenge to Jessica's Law that the trial court denied before trial. He argued that off-grid sentences were imposed to punish defendants who asserted their right to a trial and did not plead. He asked that the court not sentence him to a hard 25-year sentence but instead, release him from custody, or if it would not release him, to sentence him to "consecutive and under 10 years."

The State argued that Landeo did not meet any of the statutory criteria for a departure sentence in a Jessica's Law case. The State also argued that even if the trial court granted Landeo a "100 year" continuance, Landeo would still nevertheless be

16

unable to come forward with a mitigating factor because no mitigating factors applied. The State asked the court to sentence Landeo to two consecutive hard 25-year sentences. In support of this request, the State pointed out that S.M. was very young, that Landeo penetrated S.M.'s vagina, and apparently ejaculated on her labia minora. The State also argued that the sentences should run consecutive because the crimes involved two different victims at two different times. Finally, the State argued that Landeo's pattern of abuse of girls, including his old incest conviction, showed that he was a "danger to society," a "bully," a "predator," and "should not come out of prison."

Landeo responded, "I don't think the Court can take any consideration into any of those things [the State] raised in relation to any prior alleged history and in relation to any of those matters." He reiterated that he was not guilty of the crimes. He said that two "mitigating circumstances"—that he was not guilty and that the State's case was based on lies—outweighed any of the State's arguments. He argued that the statutory mitigating circumstances did not apply to his case because he was not guilty of the crimes.

The trial court went through each statutory mitigating factor and determined the following:

> "To even conceive that this case in its totality would warrant a mitigation or mitigating circumstance I find to be beyond comprehension.
> "The only conceivable mitigating circumstance would be a lack of significant history of prior criminal activity. That doesn't say history of prior convictions. That talks about a history of prior criminal activity which is exactly what's occurred here, ongoing abuse."

Landeo repeatedly interrupted the trial court judge as he issued the sentence from the bench, despite numerous admonitions not to do so. Finally, the trial court judge told Landeo, "I'm going to have you removed the next time you interrupt me, and we'll proceed with the sentencing without you. You understand that?" Landeo responded, "No,

Your Honor. I do not understand that. I don't understand that because compelling and cruel and unusual punishment is not—." Then, the trial court judge ordered the deputy to remove Landeo from the courtroom. After the deputy removed Landeo, Toth stood in to hear the verdict on his behalf. The trial court sentenced Landeo to a hard-25 life term for the first count of rape, and a hard-25 life term for the third count of aggravated indecent liberties, with the sentences to run consecutively.

Landeo timely appealed.

*Did the Trial Court Commit Reversible Error By Requiring Landeo to Proceed Pro Se at Sentencing?*

Landeo argues that the trial court committed reversible error by forcing him to proceed pro se at sentencing. The State argues that Landeo constructively waived his right to counsel and, therefore, the trial court did not violate Landeo's rights under the Sixth Amendment to the United States Constitution when it forced him to proceed pro se at sentencing with Toth acting as standby counsel.

The Sixth Amendment, applicable to the states through the Fourteenth Amendment, guarantees criminal defendants the right to the assistance of legal counsel during all critical stages of a criminal proceeding. *Miller v. State*, 298 Kan. 921, 929, 318 P.3d 155 (2014). "Critical stages" include sentencing hearings. *State v. Pfannenstiel*, 302 Kan. 747, 758, 357 P.3d 877 (2015). The Sixth Amendment also implicitly includes a right to self-representation. *State v. Vann*, 280 Kan. 782, 793, 127 P.3d 307 (2006). "Generally, the extent of the right to assistance of counsel is a question of law over which this court exercises unlimited review." *State v. Jones*, 290 Kan. 373, 376, 228 P.3d 394 (2010) (citing *Robertson v. State*, 288 Kan. 217, 227, 201 P.3d 691 [2009]). Violation of a defendant's Sixth Amendment right to counsel is subject to structural error analysis; that

18

is, if this court finds that a trial court violated a defendant's right to counsel, it must reverse without undertaking harmless error inquiry. *Jones*, 290 Kan. at 382-83.

Before a trial court can permit a defendant to proceed pro se, it must obtain a "knowing and intelligent waiver" from the defendant; a knowing and intelligent waiver "requires that the defendant be informed on the record of the dangers and disadvantages of self-representation." *State v. Graham*, 273 Kan. 844, 850, 46 P.3d 1177 (2002).

> "A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege. The determination of whether there has been an intelligent waiver of the right to counsel must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S. Ct. 1019, 82 L. Ed. 1461 (1938).

Courts therefore engage in "'every reasonable presumption against waiver'" of fundamental constitutional rights and "'do not presume acquiescence in the loss of fundamental rights.'" *Johnson*, 304 U.S. at 464. Accordingly, "[a] defendant's assertion of the right to self-representation must be clear and unequivocal. *State v. Irving,* 231 Kan. 258, 644 P.2d 389 (1982)." *State v. Hollins*, 9 Kan. App. 2d 487, 489, 681 P.2d 687 (1984). In keeping with these principles, "'a defendant's request to be relieved of counsel in the form of a general statement of dissatisfaction with his attorney's work does not amount to an invocation of the *Faretta* right to represent oneself.'" *Hollins*, 9 Kan. App. 2d at 489 (quoting *Moreno v. Estelle*, 717 F.2d 171, 176 [5th Cir. 1983], *cert. denied* 466 U.S. 975 [1984]).

Here, the trial court permitted Toth to withdraw at the beginning of the sentencing hearing. Then the trial court reappointed Toth as standby counsel. Landeo requested that the court continue the case and appoint him new counsel or new standby counsel. The trial court denied these requests and ordered Landeo to proceed with Toth as standby counsel. While a trial court may appoint standby counsel even over a defendant's

19

objection, standby counsel does not qualify as the assistance of counsel required by the Sixth Amendment. *Vann*, 280 Kan. at 793; *State v. Warren*, No. 110,949, 2015 WL 4879034, at *6 (Kan. App. 2015) (unpublished opinion).

Significantly in *Jones*, our Supreme Court held as follows:  "A defendant who clearly and unequivocally expresses a wish to proceed pro se has the right to represent himself or herself after a knowing and intelligent waiver of his or her right to counsel." *Jones*, 290 Kan. 373, Syl. ¶ 2. Here, however, Landeo did not "clearly and unequivocally" express "a wish to proceed pro se" by saying as much on the record. Nevertheless, the State argues that Landeo, by his actions, waived his right to representation. This concept is referred to as "constructive waiver" of the Sixth Amendment right to counsel.

Landeo's lack of cooperation caused four attorneys to withdraw. Additionally, Landeo forced two attorneys to withdraw by creating conflicts. Nonetheless, each time the trial court ran out of patience with Landeo or threatened that it was running out of attorneys to appoint, Landeo insisted that he did not want to proceed pro se. Thus, this court must determine if Landeo, through his conduct, undermined his repeated oral invocation for assistance of counsel to such a degree that he waived his right to legal representation.

This court is guided in this inquiry by several previous cases that have considered whether a trial court properly required a defendant to proceed pro se after refusing to appoint substitute counsel.

In *State v. McCormick*, 37 Kan. App. 2d 828, 839, 159 P.3d 194 (2007), "[s]hortly after being charged" in early 2003, McCormick "expressed a desire to handle his own defense until he could secure counsel." Accordingly, the trial court required McCormick to complete a written waiver of counsel "which noted the maximum sentence for each

20

charge independent of the other charges and acknowledged the rights the defendant would waive by proceeding pro se." 37 Kan. App. 2d at 839-40. McCormick later obtained private counsel who subsequently withdrew because McCormick refused to follow his advice.

After the private attorney withdrew, McCormick had a hard time finding new counsel, so the court appointed two attorneys, Mark Manna and Alice White. After Manna and White represented McCormick at several motions hearings, McCormick filed a motion requesting to represent himself. The trial court denied this motion. Then McCormick moved for substitute counsel because he disagreed with Manna and White on trial strategy. The trial court found that Manna and White's representation was not at all deficient. Moreover, the court ruled that McCormick had failed to show justifiable dissatisfaction with his attorneys. The trial court denied McCormick's motion for new counsel. As a result, McCormick chose to represent himself. The trial court appointed Manna and White to serve as standby counsel. This court concluded that the trial court judge "did not abuse its discretion in finding appointment of new counsel would be an exercise in futility under the circumstances." 37 Kan. App. 2d at 839.

Further, this court held that McCormick's waiver of his right to counsel was "knowing and intelligent" in large part because of McCormick's prior written waiver filed when he sought to represent himself immediately after he was charged. 37 Kan. App. 2d at 840.

*McCormick* is distinguishable from this case. First, McCormick had the opportunity to choose between retaining his current counsel or proceeding pro se. Here, Landeo was not presented with a clear, binary choice between proceeding with Toth or else proceeding pro se. Instead, the trial court first allowed Toth to withdraw and then the court told Landeo that it would not appoint any other attorneys to represent him.

21

After the trial but before sentencing, Landeo requested that Toth withdraw. Toth then moved to withdraw, citing Landeo's request and a "breakdown in communications between defendant and counsel [that] has interfered with counsel's ability to represent defendant."

During the posttrial motions and sentencing hearing, Toth reiterated these reasons for his motion to withdraw. The trial court asked Landeo why he was dissatisfied with Toth; he responded that he would rather discuss that issue "in camera because it goes into a lot of different issues, you know, pertaining to things that transpired at trial, prior to trial, and things of that nature." Toth told the trial court that Landeo had said "at some point, depending on what the Court does with his case, that he will be pursuing ineffective assistance claims" against Toth.

The trial court said, "I think the record of the entirety of this case, going back to July of 2013 clearly shows your efforts to avoid trial, to avoid resolution of this case. You have done everything in your power to alienate every attorney that has been appointed to represent you." The trial court further stated:

> "I think also it's not necessary for an in camera inspection as Mr. Toth said that you—I can certainly understand that you don't have trust in Mr. Toth because apparently because of the result, whatever the reason is, that you may pursue and question his legal tactical decisions in representing throughout from the time you've been involved in this and just as you have other counsel who were previously representing you in which you forced to withdraw from the case.
>
> "To now allow for Mr. Toth to withdraw and continue this with appointment of ninth or tenth counsel to represent you and then ask another attorney to come in for at least the fourth or fifth time to review the entirety of a record that's now spanned over or just at four years is not in the interest of justice to this case.
>
> "Similarly, though, I understand Mr. Toth's position that, Mr. Landeo, you've let it be known and you've even eluded to it in your various pro se motions, these six motions you filed after the jury trial verdict, that you're going to pursue whatever means,

22

whether it's ethical complaints, whether it's ineffective assistance of counsel, and there's a time and day for that, but we are going to proceed on this hearing today. I am going to allow Mr. Toth to withdraw based upon his statements here today because of the breakdown that he has had in being able to effectively represent you.

"I will appoint Mr. Toth to be a standby counsel for purposes of today's hearing in completing this case."

At no point did the trial court tell Landeo that he must choose between continuing with Toth or proceeding pro se. Rather, the trial court allowed Toth to withdraw and then told Landeo he would not be appointed any more attorneys. Thus, this case is distinguishable from *McCormick*, where McCormick "was presented with the choice of competent counsel to represent him or self-representation." 37 Kan. App. 2d at 839.

Further, the case for "knowing and intelligent waiver" of the right to counsel here is much weaker than it was in *McCormick*. McCormick twice requested to proceed pro se and completed a written waiver which "noted the maximum sentence for each charge independent of the other charges and acknowledged the rights the defendant would waive by proceeding pro se." 37 Kan. App. 2d at 839-40.

In contrast here, on December 9, 2015, the trial court advised Landeo of the role of standby counsel and that "[a]t any time that you change your mind and either retain counsel to represent you or ask the Court to appoint counsel to represent you to assist with your defense, that may be granted." The trial court asked if Landeo understood that he was charged with off-grid felonies and what that meant. Landeo replied that he understood that "they're labeled as off-grid felonies or whatever" but did not understand "the constitutional context of the validity of them" and said he "[did not] know what's going on." The trial court asked Landeo if he understood that he could be "imprisoned on each count for up to 25 years without parole." Landeo responded that he did not understand.

23

Landeo repeatedly stated that he did not understand why the court was advising him about self-representation and standby counsel or what the advice meant. He also reiterated that he did want an attorney, but that he felt his previous attorneys had provided him ineffective assistance. Thus, the December 9, 2015 hearing is far from a "knowing and intelligent waiver" because Landeo repeatedly stated that he did not understand the trial court's instructions and admonitions.

Moreover, the trial court told Landeo about the perils of proceeding pro se on December 9, 2015. Nevertheless, the trial court reversed course nine days later and appointed another attorney for Landeo. The trial court did not actually require Landeo to proceed pro se until the sentencing hearing on June 30, 2017. The trial court did not readmonish Landeo at the sentencing hearing. Thus, more than 18 months had passed between when the trial court admonitioned Landeo on December 9, 2015, and the time when it required Landeo to proceed pro se on June 30, 2017. Both the substantive content of the trial court's cautionary advice here and the amount of time between the trial court's admonitions and the trial court's ruling requiring Landeo to proceed pro se weigh against concluding that Landeo had knowingly and intelligently waived his right to counsel.

Similarly, *State v. Roberts*, 13 Kan. App. 2d 485, 773 P.2d 688 (1989), is distinguishable from this case. There, Roberts was dissatisfied with his first court-appointed attorney, so the trial court appointed a second attorney to represent him. Then the day before trial, Roberts asked the trial court to appoint him a third attorney. It is unclear from the decision exactly how and in what order the trial court went about denying Roberts' request for new counsel and then permitted him to proceed pro se. The *Roberts'* ruling states: "Roberts wanted yet another lawyer appointed to represent him. Roberts then decided he would defend himself." 13 Kan. App. 2d at 485. The trial court "painstakingly inquired into the matter by clearly advising Roberts of his right to counsel, by asking about defendant's educational background, by reviewing the nature of the charge and possible penalties, by explaining to Roberts the consequences of proceeding

24

pro se, and by recommending defendant continue with representation." 13 Kan. App. 2d at 487.

This suggests that the trial court refused to grant Roberts' request for substitute counsel and Roberts then decided to proceed pro se. It follows that next, the trial court admonished Roberts about the consequences of proceeding pro se and in fact advised him against doing so. Nevertheless, Roberts insisted he wanted to proceed pro se. Thus, it seems that Roberts, like McCormick, had the choice to proceed with his appointed attorney but instead chose to proceed pro se. Additionally, unlike this case, after the trial court warned Roberts about self-representation, he unambiguously told the court that he wanted to proceed pro se. 13 Kan. App. 2d at 486.

This case, however, is similar to *State v. Jones*, No. 118,846, 2019 WL 1087102 (Kan. App. 2019) (unpublished opinion). In *Jones*, like Landeo, Jones did not knowingly and intelligently waive his right to counsel. A waiver of the right to counsel is "strictly construed." *State v. Allen*, 28 Kan. App. 2d 784, 791, 20 P.3d 747 (2001).

Moreover, in *Jones,* unlike *McCormick* and *Roberts*, the trial court allowed Jones' attorney to withdraw and then appointed him as standby counsel. 2019 WL 1087102, at *4. Jones, unlike Landeo, refused to let his former attorney proceed as standby counsel. 2019 WL 1087102, at *4.

In 2010, Jones pled guilty to second-degree reckless murder and abuse of a child. Before sentencing, he moved to withdraw his plea. At the plea withdrawal hearing, Jones' attorney withdrew because he did not think plea withdrawal was in Jones' best interest. The trial court ordered Jones to proceed pro se with his plea withdrawal motion. The trial court denied the motion and sentenced Jones to 467 months.

25

On direct appeal, this court affirmed Jones' conviction but found that the State had violated the plea agreement and remanded for resentencing. 2019 WL 1087102, at *1. At resentencing, the trial court sentenced Jones to 360 months. Jones did not directly appeal the resentencing but filed a K.S.A. 60-1507 motion. In the 1507 motion, Jones alleged that he was denied his "constitutional right to effective representation" because his attorney refused to participate in the plea withdrawal hearing. 2019 WL 1087102, at *1. The trial court denied Jones' 1507 motion, but on appeal, this court agreed with Jones and remanded for a new plea withdrawal hearing with counsel. 2019 WL 1087102, at *1-2.

On remand, the trial court appointed a new attorney for Jones for the new plea withdrawal hearing. After about a month, Jones asked for a different attorney; the trial court allowed the first attorney to withdraw and appointed a new attorney. Then, the second attorney moved to withdraw and Jones filed a motion for replacement counsel. The trial court allowed the second attorney to withdraw but appointed him as standby counsel. Jones protested that the trial court was forcing him to proceed pro se against his will. In responding, the trial court stated that the only problem with the second attorney was the conflict Jones created and that Jones therefore had a competent attorney available but chose not to use him. Then, Jones stated that he would not let the second attorney act as standby counsel; the trial court dismissed the attorney altogether. Jones requested another attorney and the trial court denied the request. The trial court again denied Jones' motion to withdraw his plea.

Jones appealed, arguing that the trial court failed to comply with this court's mandate on remand. This court noted the following: "Although the district court found that the second attorney did not have a conflict, it allowed him to withdraw." 2019 WL 1087102, at *4. This court further determined that the trial court had failed to make a specific finding that Jones had constructively waived his right to counsel. 2019 WL 1087102, at *5. This court also ruled that the trial court did not comply with two requirements in *State v. Neal*, 292 Kan. 625, 637, 258 P.3d 365 (2011): (1) that the

26

defendant be "'fully advised and properly informed of his or her right to counsel'" and (2) that "'having been fully advised and properly informed, the defendant made a clear determination not to have counsel represent him or her before the court.'" 2019 WL 1087102, at *4-5.

Similarly, the record in this case does not support a finding that Landeo knowingly and intelligently waived his right to counsel. As discussed earlier, the trial court did not instruct Landeo about the requirements and perils of proceeding pro se when it allowed Toth to withdraw. Instead, the State relies on the December 9, 2015 hearing to establish that Landeo's purported waiver was knowingly and intelligently made. Nonetheless, as discussed previously, Landeo repeatedly stated that he did not understand the trial court's admonitions at the December 9, 2015 hearing.

Again, for a waiver of counsel to be effective, it must be knowingly and intelligently made. That is why the right to be advised of the perils of proceeding pro se is so important. The trial court warned Landeo about the risks of proceeding pro se in December 2015, but Landeo nevertheless had an attorney representing him for all but 9 days in the 18 months between the December 2015 warning and the June 2017 sentencing hearing. It is difficult to find a knowing and understanding waiver of the right to counsel since Landeo was not warned about the perils of proceeding pro se again after December 2015. The right to counsel is so important that its waiver should not be presumed. Waiver should be shown by some positive act.

For example, in *McCormick*, McCormick's positive acts were the following: He twice requested to proceed pro se and completed a written waiver which "noted the maximum sentence for each charge independent of the other charges and acknowledged the rights the defendant would waive by proceeding pro se." 37 Kan. App. 2d at 839-40. Moreover, in *Roberts*, Roberts' positive act was that he told the trial court he wanted to

27

proceed pro se after the trial court warned him about self-representation. 13 Kan. App. 2d at 486. Here, Landeo's positive act of waiver or wanting to proceed pro se is lacking.

Additionally, whereas the *Jones* trial court specifically found that Jones' second attorney did not have a conflict, here, the trial court stated on the record that it found that Toth had a conflict with Landeo: "You have put yourself in position where you're representing yourself now at this point. And Mr. Toth would not be making that kind of assistance to you because you have shown that you have a conflict with him and he has withdrawn as your attorney of record in this case." Moreover, the trial court acknowledged that a breakdown had occurred between Toth and Landeo and that Toth could not effectively represent Landeo.

The *Jones* court stated the following about a possible conflict in representation: "If Jones asserts that the new attorney has a conflict, he bears the burden to present an articulated statement of justifiable dissatisfaction in order to trigger the district court's duty to inquire further." 2019 WL 1087102, at *5. In addition, the *Jones* court also stated:

> "Should Jones do so, the district court must make an appropriate inquiry to determine if there is in fact a conflict of interest. This is true '"even when [a] defendant is seemingly engaging in delay tactics, because such a delaying strategy . . . is often employed where [a] defendant does not understand the crucial role of counsel in criminal cases."'" 2019 WL 1087102, at *5.

The *Jones* court further explained:

> "The district court may deny a request for new counsel if it determines that 'there is a reasonable basis for believing the attorney-client relationship has not deteriorated to a point that appointed counsel could not give effective aid in the presentation of the client's defense.' [Citation omitted.] In this case, if the district court determines that there is 'justifiable dissatisfaction with Jones' appointed counsel,' it should appoint a competent

28

attorney to represent him. On the other hand, if the district court concludes that Jones lacks justifiable dissatisfaction with his appointed counsel, it should make the appropriate findings and explain its decision on the record." 2019 WL 1087102, at *5.

Here, the trial court appointed Toth as standby counsel even though the court acknowledged that Toth had a conflict with Landeo. Moreover, Toth acted as standby counsel when the trial court had Landeo removed from the courtroom before he was sentenced. Thus, because of Toth's conflict and the trial judge's acknowledgement that Toth could no longer assist Landeo, the trial judge should not have appointed Toth as standby counsel to represent Landeo. The trial court should have appointed competent, conflict free counsel to represent Landeo. See *State v. Stovall*, 298 Kan. 362, 370, 312 P.3d 1271 (2013) ("The right to counsel encompasses the right to representation that is free from conflicts of interest.").

Nevertheless, the *Jones* court pointed out if a defendant continues to object to appointed counsel after a determination has been made by the trial court of no justifiable dissatisfaction, the court should do the following:

> "If Jones continues to object to appointed counsel after a determination has been made that there is no justifiable dissatisfaction, the district court should clearly advise him on the record of his right to counsel, explain to him the potential consequences of proceeding pro se, and recommend to him that he continue with representation by appointed counsel. In addition, the district court should also explain that although the Sixth Amendment guarantees a defendant the right to counsel, it does not guarantee the right to a particular counsel. See *State v. Vann*, 280 Kan. 782, Syl. ¶ 3, 127 P.3d 307 (2006) ('A knowing and intelligent waiver requires that the defendant be informed on the record of the dangers and disadvantages of self-representation.').
>
> "If Jones still continues to object to representation by appointed counsel after being fully informed of his rights and the potential dangers of self-representation, the district court should make a determination on the record whether he has waived his right to counsel by his conduct and, if so, whether appointment of new counsel would be an

29

exercise in futility under the circumstances presented. After doing so, the district court may order Jones to proceed pro se. If it does so, the district court should appoint competent standby counsel for the defendant. *Vann*, 280 Kan. at 793 (The district court should 'appoint "standby counsel" even over the defendant's objection, to assist the pro se defendant in his or her defense.') (citing *Faretta v. California*, 422 U.S. 806, 834 n.46, 95 S. Ct. 2525, 45 L. Ed. 2d 562 [1975])." 2019 WL 1087102, at *6.

Turning to the issue in this case once again, the majority notes that the dissent focuses on a conclusion that Landeo was given a clear choice between proceeding with his attorney (Toth) or proceeding pro se. The dissent concludes as follows: "Landeo was thus presented with a clear, binary choice immediately before he forced Toth to withdraw." Slip op. at 64. We disagree.

The dissent bases this conclusion on the letter that Toth sent Landeo two weeks before his sentencing hearing on June 30, 2017, telling Landeo about the possible consequences of his actions in demanding that Toth withdraw as his counsel. The advice given in Toth's letter to Landeo forms the minor premise of the dissent's syllogism. The major premise for the dissent's conclusion seems to be based on an Eleventh Circuit federal court case: *Jones v. Walker*, 540 F.3d 1277 (11th Cir. 2008). In *Jones*, the court stated the following: "So long as a defendant knows the risks associated with self-representation, it is irrelevant for constitutional purposes whether his understanding comes from a colloquy with the trial court, a conversation with his counsel, or his own research or experience." 540 F.3d at 1293.

Nevertheless, the majority's research has revealed no Kansas authority in which an advice letter sent by a withdrawing defense attorney to his or her client, explaining what the trial court might do once that attorney withdraws from the case, would be constitutionally sufficient under the Sixth Amendment to the United States Constitution to advise or to warn the defendant of the risks associated with self-representation. Indeed, the majority's research has shown that it is the duty of the trial court, not the defendants'

30

attorney, to insure that defendants are fully told and properly informed of their right to an attorney, and after they have been fully told and properly informed, the trial court must make sure that the defendants have made a clear determination not to be represented by counsel before the court. See *Neal*, 292 Kan. at 637.

The dissent's previously quoted conclusion ignores our Supreme Court pronouncement in *State v. Hughes*, 290 Kan. 159, 171, 224 P.3d 1149 (2010), where the court declared:  "It is not up to the defendant to know what ′fully advised′ means. It is the judge who is burdened with assuring that Hughes' rights have been adequately protected." See also *State v. Carter*, 284 Kan. 312, 321, 160 P.3d 457 (2007) ("It is the task of the district court judge to insure that a defendant's right to counsel under the Sixth Amendment to the United States Constitution is honored.").

Based on Kansas law, the dissent's major premise is overbroad; it claims too much. Moreover, it ultimately imputes to a defendant the knowledge and understanding of the risks associated with self-representation wherever the source of such knowledge or understanding may come from, namely:  (1) a colloquy with the trial court; (2) a conversation with defendant's counsel; or (3) a defendant's own research experience. Thus, the dissent's major premise rejects settled principles of Kansas law.

Even when we consider the trial court's admonitions to Landeo on December 9, 2015, we note that the trial court implicitly conceded that Landeo's conduct or behavior up to then was insufficient to warrant an effective waiver of his right to counsel because just nine days later, the trial court appointed Landeo new counsel to represent him. Eighteen months later, no admonishment or warning was given by the trial court to Landeo before it forced him to proceed pro se. Thus, because the trial court failed to make sure that Landeo had made a clear determination not to be represented by competent, conflict free counsel before it forced him to proceed pro se, it rendered any

31

constructive waiver of counsel uninformed under Kansas law. And this was structural error.

The sentences imposed are vacated and remanded for resentencing. On remand, the trial court should appoint a new attorney for Landeo and hold a new sentencing hearing. If more disagreements arise between Landeo and the new counsel, the trial court should follow the directions given in this court's *Jones'* decision.

*Should This Court Vacate Landeo's Convictions for Violation of His Speedy Trial Rights?*

Landeo argues that the four-year delay between his arrest and trial violated his speedy trial rights, and that this court must therefore vacate his convictions. The State disagrees, arguing that most of the delay was in fact attributable to Landeo. The State is correct.

Here, police arrested Landeo in July 2013 and he remained in custody, unable to make bail until trial. Toth filed a motion to dismiss the case on constitutional speedy trial grounds on November 22, 2016. On February 22, 2017, the trial court held a hearing on the motion. The trial court denied Toth's motion, noting that "the delays throughout this case are primarily by the determined and deliberate or intentional acts by Mr. Landeo. . . . He has made a deliberate effort to delay this himself as long as he can." On February 27, 2017, Landeo filed an affidavit stating that he did not consent to trial.

The Sixth Amendment affords criminal defendants the right to a speedy trial. *State v. Pressley*, 290 Kan. 24, 27, 223 P.3d 299 (2010). Appellate courts exercise unlimited review to determine whether a defendant's constitutional speedy trial rights were violated. *State v. Rivera*, 277 Kan. 109, 113, 83 P.3d 169 (2004). In *Barker v. Wingo*, 407 U.S. 514, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972), the United States Supreme Court laid out four factors courts must consider to determine if a defendant's constitutional speedy trial

rights have been violated. They include: "(1) the length of the delay, (2) the reason for the delay, (3) the defendant's assertion of his or her right, and (4) prejudice to the defendant." *State v. Gill*, 48 Kan. App. 2d 102, 108, 283 P.3d 236 (2012) (citing *Barker*, 407 U.S. at 530). "None of the factors are controlling in determining whether a defendant's constitutional right to a speedy trial has been violated, but the factors must be considered together with such other circumstances as may be relevant." 48 Kan. App. 2d at 108.

*Length of the delay*

The trial court found that the length of the delay in this case was presumptively prejudicial; both Landeo and the State agree with this assessment on appeal.

There is no set point at which a delay becomes presumptively prejudicial; courts must consider both the length of the delay and the circumstances of the case. *State v. Hayden*, 281 Kan. 112, 127-28, 130 P.3d 24 (2006). Here, Landeo was arrested in July 2013 and went to trial in May 2017, a delay of about four years; he was charged with three off-grid felonies. In *Rivera*, our Supreme Court found that a delay of 244 days between a defendant's arrest and preliminary hearing was presumptively prejudicial in an aggravated robbery and aggravated assault case. *Rivera*, 277 Kan. 109, Syl. ¶ 4. In *State v. Ruff*, 266 Kan. 27, 32, 967 P.2d 742 (1998), our Supreme Court concluded that a three-year delay in a case alleging multiple rapes was "significant, warranting a consideration of the other *Barker* factors." Finally, in *State v. Fitch*, 249 Kan. 562, 563-64, 819 P.2d 1225 (1991), our Supreme Court held that a 402-day delay in a burglary and felony theft case was presumptively prejudicial. We conclude that the delay in this case was presumptively prejudicial.

33

*Reason for the delay*

Courts assign different weights to different reasons for delay. *Rivera*, 277 Kan. at 114. "For example, a deliberate attempt by the State to thwart the defense would weigh heavily against the State. However, a more neutral reason, like negligence or a crowded court docket, would weigh less heavily against the State." 277 Kan. at 114. This court attributes to a defendant the time associated with the defendant's request for a new attorney and the time required for that new attorney to get up to speed on the case. See, e.g., *State v. Sullivan*, No. 96,247, 2008 WL 142108, at *2-3 (Kan. App. 2008) (unpublished opinion) ("[A]t Sullivan's request, the district court appointed new counsel for Sullivan on four separate occasions. . . . In contrast, the only delay clearly attributable to the State occurred . . . when Sullivan's third appointed counsel became employed as an assistant county attorney, necessitating appointment of the Attorney General's office to represent Sullivan.").

The trial court here concluded that "the delays throughout this case are primarily by the determined and deliberate or intentional acts by Mr. Landeo . . . . He has made a deliberate effort to delay this himself as long as he can." The State agrees with this assessment. Landeo, however, argues that "a considerable part of the delay was due to the district court's failure to bring this matter to trial." Landeo argues that the trial court is at fault for the delay because it continually granted his requests for new attorneys.

Effectively, Landeo seeks to have his cake and eat it too with respect to his constant conflict with his appointed attorneys. In issue I above, he faults the trial court for not granting him yet another attorney, which would have inevitably delayed the case further. Yet, here in issue II, he says that his convictions ought to be reversed because the trial court allowed his attorneys to withdraw, most often at Landeo's own request. As the State correctly points out in its brief, Landeo is incorrect. Much of the delay in this case

34

was in fact attributable to him; this factor accordingly weighs against a finding that his speedy trial rights were violated.

The trial court appointed Cline and Goodwin to represent Landeo after his arrest in July 2013. Between July 2013 and April 2014, Cline and Goodwin requested eight continuances. The trial court allowed Cline and Goodwin to withdraw at Landeo's request in April 2014. The trial court told Landeo it assessed the resulting delay against him.

The trial court then appointed Keck, who withdrew shortly thereafter. Next, the trial court appointed Todd. Todd moved for five continuances between April and September 2014 until Landeo requested to remove Todd. In November 2014, the trial court removed Todd at Landeo's request and appointed Billam. The trial court again assessed the delay against Landeo.

In February 2015, the trial court dismissed Billam at Landeo's request. The trial court assessed this delay against Landeo. The trial court appointed Dupree to represent Landeo. Dupree requested four continuances before June 2015. In May 2015, Landeo filed a motion to recuse the trial judge. In June 2015, Dupree moved to withdraw because Landeo filed a disciplinary complaint against him. On June 12, 2015, the trial court dismissed Dupree and assessed against Landeo all the time associated with Dupree's withdrawal and Landeo's motion to recuse the judge.

On August 11, 2015, the trial court appointed Parrett to represent Landeo. Parrett sought two continuances before he had to withdraw in November 2015 because Landeo caused a conflict by subpoenaing Parrett. At the next hearing on December 9, 2015, the trial court decided it would force Landeo to proceed pro se with standby counsel and cautioned him accordingly.

35

Nine days later the trial court reversed course and appointed another attorney, Cornwell, for Landeo. Cornwell requested three continuances before withdrawing for health reasons in May 2016. The trial court assessed all delay from May 2016 until August 4, 2016, against Landeo.

The trial court appointed Toth in May 2016. Toth requested five continuances before the February 22, 2017 hearing on the motion to dismiss the case on speedy trial grounds. Also on February 22, 2017, the defense requested another continuance. On February 27, 2017, Landeo filed a pro se affidavit saying he did not consent to trial. Then on March 8, 2017, the trial court held a hearing at Toth's request about his conflict with Landeo. After this hearing, Toth requested two more continuances before the May 15, 2017 trial start date.

Virtually all of the delays detailed above are attributable to Landeo, with the exception of the nine-day December 2015 period when the trial court stated it would make Landeo proceed pro se before reversing course. The record shows that the trial court was correct and that the delays in this case were largely due to Landeo's conduct and conduct by his attorneys that was in turn attributable to him. See *Vermont v. Brillon*, 556 U.S. 81, 94, 129 S. Ct. 1283, 173 L. Ed. 2d 231 (2009) ("delays caused by defense counsel are properly attributed to the defendant, even where counsel is assigned"). Accordingly, this factor weighs against a finding that Landeo's constitutional speedy trial rights were violated.

*Defendant's assertion of his right*

A defendant's failure to assert his or her right to a speedy trial "'will make it difficult for the defendant to prove that he was denied a speedy trial. [Citation omitted].'" *Rivera*, 277 Kan. at 117. Here, Toth filed a motion to dismiss on speedy trial grounds in November 2016, and the motion was denied in February 2017. Five days later, Landeo

36

filed a pro se affidavit stating that he did not consent to trial. Even Toth conceded that Landeo's affidavit undermined Toth's motion.

> "As the Court knows, the substantive motion that I filed for Mr. Landeo was an attack on his constitutional, speedy trial rights. And one of the elements that I was required to argue to the Court was that Mr. Landeo has asserted his right to a speedy trial. That, I think, is an important argument; I've made the argument; the Court ruled on the argument. But it's very clear now that even though Mr. Landeo's been directed not to file pro se motions, not only by the Court but by me, this affidavit that he files the day of my correspondence is—it just, essentially, makes my argument moot."

At best, this factor is neutral for Landeo since he has both asserted and disavowed his right. At worst, Landeo's affidavit refusing to consent to trial makes this factor weigh against a finding that Landeo's speedy trial rights were violated.

*Prejudice*

"[T]he Sixth Amendment right to a speedy trial was designed to (1) prevent oppressive pretrial incarceration; (2) minimize anxiety and concern of the accused; and (3) limit the possibility the defense will be impaired. [Citation omitted.]" *Gill*, 48 Kan. App. 2d at 115. It is undisputed that Landeo remained in custody from the time of his arrest until the time of trial. He petitioned multiple times for bail reduction, but was denied. When a defendant faces an extended delay before trial, "'[p]rejudice may fairly be presumed simply because everyone knows that memories fade, evidence is lost, *and the burden of anxiety upon any criminal defendant increases with the passing months and years*. [Citation omitted.]'" *State v. Fitch*, 249 Kan. 562, 566, 819 P.2d 1225 (1991).

On appeal, Landeo argues that he was prejudiced because his "lengthy pretrial incarceration, with the majority of time in maximum custody . . . created anxiety." He

also argues that being in prison, specifically maximum custody, "hampered his ability to assist in his defense." These arguments are unavailing.

As discussed previously, the delays in this case were largely caused by Landeo. In addition to his pattern of firing attorneys, Landeo also slowed the case by filing numerous and often repetitive pro se motions despite admonitions from many of his attorneys that the motions were frivolous and without merit. Indeed, the State repeatedly indicated that it was ready and willing to go to trial as far back as fall 2013. Thus, even if Landeo were to convincingly show "prejudice" because of the delay, the responsibility for the prejudice lies primarily with him and, therefore, should not weigh in favor of a finding that his speedy trial rights were violated.

In sum, while Landeo did remain in custody for approximately four years before his trial, his speedy trial rights were nevertheless not violated because Landeo himself was responsible for nearly all of the delays.

*Did the Trial Court Err by Denying Landeo's Motion to Sever S.M.'s Allegations from L.V.'s Allegations?*

Landeo argues that the trial court erred by denying his motion to sever the charges related to S.M. from the charges related to L.V., and that this court should remand for separate new trials. The State first argues that Landeo failed to preserve this issue for appellate review. Second, the State argues that the trial court correctly denied Landeo's motion to sever the allegations.

In its first complaint dated July 1, 2013, the State charged Landeo with rape of a child under the age of 14 with respect to S.M. On October 21, 2013, the State amended the complaint to include an alternative charge of aggravated indecent liberties with respect to S.M. and two alternative counts of aggravated indecent liberties with respect to

38

L.V. On October 31, 2013, the State filed its second amended complaint charging Landeo with rape of S.M. or, in the alternative, aggravated indecent liberties with S.M., and two alternative counts of aggravated indecent liberties with respect to L.V. In January 2014, Cline filed a motion to sever the charges pertaining to S.M. from the charges pertaining to L.V. On February 11, 2014, the State filed a third amended complaint dropping one of the alternative aggravated indecent liberties charges with respect to L.V. On February 12, 2014, the trial court heard argument on the motion to sever.

The trial court denied Landeo's motion to sever the charges. The trial court found that joinder was appropriate, particularly given our Supreme Court's holding in *State v. Bunyard*, 281 Kan. 392, 403, 133 P.3d 14 (2006), that "[j]oinder is the rule and severance the exception." Further, the trial court noted that under *State v. Hill*, 257 Kan. 774, 781, 895 P.2d 1238 (1995), the charges were "sufficiently similar such that evidence of one incident would be admissible under K.S.A. 60-455 in the trial of the other and no prejudice would result to the defendant."

*Preservation*

On appeal, the State argues that Landeo failed to preserve this issue for appellate review because he failed to object to joinder again at trial. The State argues that a motion to sever is "a question of the admission of evidence at trial" and, therefore, "a timely objection is required" under *State v. Brown*, 307 Kan. 641, 413 P.3d 783 (2018). Nevertheless, the State concedes that there is no Kansas caselaw supporting its contention that in order to preserve the issue for appeal, a defendant must object to joinder again at trial after losing a pretrial motion to sever. The State cites an over-30-year-old Montana Supreme Court case as its authority on this issue: *State v. Howie*, 744 P.2d 156, 158 (Mont. 1987).

In his reply brief, Landeo highlights the lack of Kansas authority supporting the State's argument. Further, he argues that "the motion to sever is not an evidentiary issue. It is an assertion that the State cannot combine charges arising from differing allegations and involving different alleged victims into a single complaint."

Landeo is correct. The State lacks authority for its contention that Landeo's argument was not preserved. This issue was sufficiently preserved for appeal because Landeo moved to sever the charges pretrial, and the trial court denied this motion.

*Joinder*

Appellate courts consider issues of joinder using a three-step analysis.

"'First, we consider whether K.S.A. 22-3203 permitted joinder. Under that statute, multiple complaints against a defendant can be tried together if the State could have brought the charges in a single complaint. K.S.A. 22-3202(1) spells out the three conditions permitting the joining of multiple crimes in a single complaint. Whether one of the conditions is satisfied is a fact-specific inquiry, and we review the district court's factual findings for substantial competent evidence and the legal conclusion that one of the conditions is met de novo. See *State v. Gaither*, 283 Kan. 671, 684-85, 156 P.3d 602 (2007).

"'Second, because K.S.A. 22-3202(1) provides that charges "may" be joined, a district court retains discretion to deny a joinder request even if a statutory condition is met. We review this decision for an abuse of discretion. See *Gaither*, 283 Kan. at 685.

"'Finally, if an error occurred in the preceding steps, we determine whether the error resulted in prejudice, *i.e.*, whether the error affected a party's substantial rights. K.S.A. 2012 Supp. 60-261.' *State v. Hurd*, 298 Kan. 555, 561, 316 P.3d 696 (2013)." *State v. Ritz*, 305 Kan. 956, 961, 389 P.3d 969 (2017).

Further, the party arguing that the trial court erred by denying a motion to sever has the burden on appeal to establish a clear abuse of discretion. *State v. Carr*, 300 Kan. 1, 94,

331 P.3d 544 (2014), *rev'd on other grounds* 577 U.S. ___, 136 S. Ct. 633, 193 L. Ed. 2d 535 (2016).

*K.S.A. 22-3202(1)*

K.S.A. 22-3202(1) provides:

"Two or more crimes may be charged against a defendant in the same complaint, information or indictment in a separate count for each crime if the crimes charged, whether felonies or misdemeanors or both, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan."

The trial court here held that the charges involving S.M. and the charges involving L.V. were of "similar character." The similarities between the charged acts include: both victims knew Landeo prior to the incidents, both victims were young girls whose families lived in Landeo's house while he resided in the basement, both incidents took place on Landeo's bed, and both acts involved digital penetration. On appeal, Landeo does not challenge the trial court's factual findings, but argues that the trial court erred by concluding that the charges were sufficiently similar to be tried together. This legal conclusion is reviewed de novo. See *State v. Gaither*, 283 Kan. 671, 684-85, 156 P.3d 602 (2007).

Landeo acknowledges that existing caselaw largely errs on the side of joinder. See *Bunyard*, 281 Kan. at 403. Nevertheless, he argues that this caselaw "has made joinder automatic and rendered K.S.A. 22-3202 meaningless." He argues that "[m]ore than similar charges and a common defendant should be needed to combine charges against a defendant given the enormous prejudice inherent in bringing multiple, but separate accusers against a defendant in a single trial in front of a single jury."

41

Simply put, such is already the case here. The allegations here did not just involve two unlike allegations by young girls against Landeo. Instead, the record reveals a common modus operandi between the crimes. Landeo developed close relationships with both girls' families. Both families moved in with Landeo. In both cases, Landeo lived in the basement while the girls' families lived upstairs. In both cases, Landeo inappropriately touched the girls on his bed in his bedroom after the girls' families had moved in upstairs. Well-established caselaw holds that cases with similar modus operandi and similar victims satisfy the "same or similar character" condition of K.S.A. 22-3202(1).

> "On the first statutory condition, crimes of the same or similar character, we note that earlier Kansas cases that have held consolidation or joinder to be appropriate have generally had multiple commonalities, not merely the same classification of one of the crimes charged. See *State v. Carr*, 300 Kan. 1, 101-04, 331 P.3d 544 (2014) (victims identified defendants; aspects of modus operandi consistent between crimes); *State v. Cruz*, 297 Kan. 1048, 1055, 307 P.3d 199 (2013) (both victims leaving nightclub at closing time; both accosted before reaching vehicle; both had little warning before shot repeatedly; same gun used; defendant identified in both cases; both cases charged first-degree murder, criminal possession of firearm); *State v. Gaither*, 283 Kan. 671, 687, 156 P.3d 602 (2007) (both victims drug dealers; defendant on quest for drugs during both; both victims shot with 9 mm handgun; both occurred in private dwellings; 5-day time span); *State v. Barksdale*, 266 Kan. 498, 506-10, 973 P.2d 165 (1999) (both crimes murder; victims killed in similar manner; robbery common motive); *State v. Crawford*, 255 Kan. 47, 48, 53-54, 872 P.2d 293 (1994) (both crimes robbery; victims identified defendant; similar modus operandi)." *State v. Smith-Parker*, 301 Kan. 132, 157-58, 340 P.3d 485 (2014).

Thus, the trial court here did not err when it concluded that the charges here were sufficiently similar to be consolidated in one trial.

With respect to the second step of analysis, Landeo failed to argue that the trial court abused its discretion by permitting joinder. Thus, he has abandoned this argument because issues not adequately briefed are deemed waived or abandoned. *State v. Arnett*, 307 Kan. 648, 650, 413 P.3d 787 (2018).

With respect to the third step of analysis, Landeo argues that he was prejudiced by the trial court's denial of his motion to sever. Because Landeo failed to show error at step one or two of the *Ritz* analysis outlined above, this court need not proceed to step three and determine whether any error resulted in prejudice. See *Ritz*, 305 Kan. at 961. Further, even if this court were to reach the issue of prejudice, this court would conclude that no prejudice occurred because of the way the trial court instructed the jury:

> "Each crime charged against the defendant is a separate and distinct offense. You must decide each charge separately on the evidence and law applicable to it, uninfluenced by your decision as to any other charge. The defendant may be convicted or acquitted on any or all of the offenses charged. Your finding as to each crime charged must be stated in a verdict form signed by the Presiding Juror."

As our Supreme Court has noted, "[a]ppellate courts have ascribed to the hypothetical presumption that such an instruction negates the inherently prejudicial effect of trying a person on multiple counts." *State v. Cruz*, 297 Kan. 1048, 1058, 307 P.3d 199 (2013). Thus, Landeo's argument that he was prejudiced by the joinder of the charges is not compelling.

*Did the Trial Court Commit Reversible Error by Allowing in K.S.A. 60-455 Testimony by L.V. About Prior Abuse?*

Generally, evidence of a defendant's prior criminal or civil wrongs are not admissible at trial. See K.S.A. 2018 Supp. 60-455(a). Nevertheless, our Legislature enacted K.S.A. 2018 Supp. 60-455(b) which provides that "[s]ubject to K.S.A. 60-445

43

and 60-448 . . . such evidence is admissible when relevant to prove some other material fact including motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident." Our Legislature went even further with respect to evidence of prior sexual misconduct in cases involving sex crimes. Under K.S.A. 2018 Supp. 60-455(d):

> "Except as provided in K.S.A. 60-445, and amendments thereto, in a criminal action in which the defendant is accused of a sex offense under . . . articles 54, 55 or 56 of chapter 21 of the Kansas Statutes Annotated, or K.S.A. 21-6104, 21-6325, 21-6326 or 21-6419 through 21-6422, and amendments thereto, evidence of the defendant's commission of another act or offense of sexual misconduct is admissible, and may be considered for its bearing on any matter to which it is relevant and probative."

To determine if 60-455(d) evidence should be admitted, trial courts balance the probative value of the evidence with the prejudicial effect of said evidence. *State v. Bowen*, 299 Kan. 339, 348, 350, 323 P.3d 853 (2014).

> "[T]he admission of evidence of other crimes or civil wrongs [is] guided by a multistep analysis, set out as follows: First, the district court must determine whether the evidence is relevant to prove a material fact, *e.g.*, whether the evidence concerns intent, motive, knowledge, or identity. Appellate review for materiality is de novo. The court must then determine whether the material fact is in dispute and ensure that the evidence is probative of the disputed material fact. Appellate courts review the district court's determination of probative value for abuse of discretion. Next, the district court must determine whether the probative value of the evidence outweighs the potential for creating undue prejudice. Appellate review of this determination is also for abuse of discretion." *State v. Hart*, 297 Kan. 494, 511, 301 P.3d 1279 (2013).

Here, the State charged Landeo with three offenses under K.S.A. Chapter 21. Before trial, the State moved to admit testimony by L.V. about sexual abuse by Landeo prior to the charged incident. The State sought to admit the testimony to show that

Landeo had a sexual intent when he penetrated S.M. When questioned by police, Landeo said that any penetration of S.M. was an accident that occurred while he checked to see if she had wet the bed. Accordingly, the State also wanted to use L.V.'s testimony to establish a lack of mistake. Further, the State sought to admit the testimony under K.S.A. 2018 Supp. 60-455(d).

The trial court granted the State's motion; it found that the evidence was admissible and "not unduly prejudicial." On the first day of trial, the State submitted as evidence a tape of L.V.'s forensic interview at Sunflower House. On this tape, she discusses not just the charged allegations but a history of sexual abuse beginning when she was six or seven. On the second day of trial when L.V. was slated to testify, Toth noted that he did not represent Landeo at the time of the 60-455 motion, but asked the trial court to consider a continuing objection to all 60-455 evidence "for appeal purposes." The trial court overruled the objection on the same grounds as its prior ruling, but stated it considered Toth's objection "as ongoing contemporaneous objections by the Defendant."

*Preservation*

On appeal, Landeo argues that he preserved this issue for review because the trial court considered his objection to be contemporaneous and standing. The State similarly asks this court to "consider this issue as if it had been timely objected to."

Nevertheless, the record lacks a specific, contemporaneous objection to the evidence. Under K.S.A. 60-404, "[g]enerally, to preserve an evidentiary issue for appellate review, the complaining party must have lodged a timely and specific objection at trial." *State v. Dupree*, 304 Kan. 43, 62, 371 P.3d 862 (2016). The full record of Toth's objection on the second day of trial is as follows:

"MR. TOTH: I did, Your Honor. Yesterday, as the Court knows, you admitted State's Exhibit No. 6, which I think is the Sunflower interview of [L.V.]. I want to make sure since I did not represent Mr. Landeo during the time frame that the 60-455 issue was litigated—I, typically, when the Court rules against me on an issue like that that I know to object time after time at trial would be disruptive, so I ask the Court for a standing objection, continuing objection for appeal purposes. I don't know if Mr. Landeo's attorney did that.

"The State's motion was Document 29. The Court granted the motion in Document 42. Mr. Landeo filed a couple of *pro se* motions regarding that in Documents 45 and 51.

"Given the fact that I expect [L.V.] to testify today and continue to talk about 60-455 evidence, I would ask the Court to consider a standing objection to any evidence that falls within the purview of that, including the testimony received yesterday.

"THE COURT: Mr. Covington, anything you want to state on those points?

"MR. COVINGTON: No, Judge. And I appreciate Counsel not interrupting the flow of evidence. And I think it's appropriate and proper for the Court to note the Defendant's objection to any 60-455 evidence within this case, and I'd ask the Court to note it and overrule it based on its prior rulings.

"THE COURT: All right. Thank you, Counsel.

"I will take the Defendant's objection to the testimony both as contained in State's Exhibit 6 and now prior to the anticipated testimony of [L.V.], I will take that objection as being a standing objection going forward, contemporaneous with the presentation of the State's evidence with regard to the 60-455.

"I will stand by the rulings that were made previously both in the ruling on the State's motion to admit evidence under 60-455 back in January of 2014, which was ruled on on March 26, 2014.

"And as noted by Mr. Toth, it was also brought up again in *pro se* filings that Mr. Landeo made September 25, 2014, on his motion to void for vagueness under K.S.A. 60-455, as well as in the State's response that was made in 2014. Those motions, I believe, were also part of the cumulative review of *pro se* motions and rulings on those motions that we had back on April 12th of this year.

"I will stand by those rulings, overrule the objections. I will consider those as ongoing contemporaneous objections by the Defendant."

Toth failed to outline specific grounds for his objection. In his brief, Landeo fails to point to any other place in the record where he provided a specific objection to the 60-455 evidence. Because Toth failed to assert any new grounds for his objection at trial, this court will presume that he, effectively, raised the same arguments asserted in Cline's opposition to the State's 2014 motion to admit K.S.A. 60-455 evidence.

When Cline responded to the State's motion to admit the 60-455 evidence in 2014, she raised the following arguments. First, she argued that "the State does not get to dictate a defendant's trial defense," so the State cannot say for certain that it will need to use the testimony to show intent or lack of mistake and, therefore, "unless or until the defendant offers some defense that puts intent at issue, intent is not relevant or material." Second, with respect to admissibility under 60-455(d), Cline conceded that "the current state of the law" was that "as long as the evidence is of another act or offense of sexual misconduct and is relevant to propensity or any matter, it is admissible" given that the trial court undertakes the probative versus prejudicial balancing test. She wrote that "for appeal purposes [defendant] states the belief that this is simply bad law and should be re-considered."

At trial, Toth mentioned that Landeo addressed K.S.A. 60-455 in two pro se filings. It is not entirely clear from the record, but it appears that one of these filings was a pro se motion to void K.S.A. 60-455 for vagueness. There, he argued that K.S.A. 60-455 was void for vagueness and violated the Fourteenth Amendment's guarantee of equal protection. It is unclear from the record what the other relevant filing is; Landeo does not clarify this in his brief.

Landeo's arguments on appeal do not match the arguments that either he or Cline made below. On appeal, Landeo argues that the K.S.A. 60-455 evidence was not probative because of the amount of time between the prior misconduct and the charged

acts. He also argues that the probative value of the evidence was outweighed by its prejudicial impact.

This mismatch prevents this court from reaching this issue on the merits. The purpose of the specific, contemporaneous objection rule is to give trial courts "'the opportunity to conduct the trial without using the tainted evidence, and thus avoid possible reversal and a new trial.'" *State v. King*, 288 Kan. 333, 342, 204 P.3d 585 (2009). A defendant cannot object to evidence on one ground at trial, then assert another ground on appeal. *State v. Richmond*, 289 Kan. 419, Syl. ¶ 4, 212 P.3d 165 (2009). Doing so precludes appellate review. See 289 Kan. at 429.

Finally, even if this court were to address Landeo's arguments on their merits, his arguments would nevertheless fail. He argues that "[w]hile the prior bad acts may have some probative value, it is outweighed by the prejudicial impact." He also argues that "the time gap and unsubstantiated nature of the allegations undercuts [their] probative value."

As explained earlier, this court reviews for abuse of discretion a trial court's determination that the probative value of the K.S.A. 60-455 evidence exceeds its prejudicial value. *Hart*, 297 Kan. at 511. While "no set test exists for weighing probative value against prejudicial effect," Kansas courts frequently consider the factors outlined in *United States v. Benally*, 500 F.3d 1085, 1090-91 (10th Cir. 2007). *State v. Boysaw*, 309 Kan. 526, 541, 439 P.3d 909 (2019). These factors include the following:

> "[H]ow clearly the prior act was proved; how probative the evidence is of the material fact sought to be proved; how seriously disputed the material fact is; and whether the government can obtain any less prejudicial evidence. In evaluating the possible prejudicial effect of evidence of other crimes or civil wrongs, the district court should consider, among other factors: the likelihood that such evidence will contribute to an improperly based jury verdict; the extent to which such evidence may distract the jury

48

from the central issues of the trial; and how time consuming it will be to prove the prior conduct." *Boysaw*, 309 Kan. at 541.

Here, the trial court concluded:

"Evidence that Defendant touched a minor in a sexual manner on multiple occasions, in the same manner as a more recent incident in which a minor reported Defendant touched her in a sexual manner, is probative to show Defendant's propensity to commit the alleged acts as well as the relationship between his prior conduct and the alleged acts."

A trial court abuses its discretion if it bases its decision on an error of law or fact, or if the decision is arbitrary, fanciful, or unreasonable. See *State v. Mosher*, 299 Kan. 1, 3, 319 P.3d 1253 (2014). The party arguing that a trial court abused its discretion bears the burden to show such an abuse. *State v. Stafford*, 296 Kan. 25, 45, 290 P.3d 562 (2012). Landeo has not satisfied his burden to show that the trial court abused its discretion here. Landeo attacks the trial court's decision but has not shown that the trial court based its decision on an error of law or fact, or that no reasonable person could conclude that the evidence was more probative than prejudicial.

*Should This Court Reverse Landeo's Convictions for Cumulative Error?*

Landeo argues that this court should reverse because "[t]aken together, the errors addressed in this brief prejudiced Landeo and denied him a fair trial." As discussed above, the only error correctly identified in Landeo's brief was his lack of representation at his sentencing hearing. This court remands this case for resentencing, thereby addressing the only identifiable trial error. After that error is addressed on remand, the record contains no further errors and, thus, there is no cumulative error. See *State v. Love*, 305 Kan. 716, 737, 387 P.3d 820 (2017) ("if there is no error or only a single error, cumulative error does not supply a basis for reversal").

49

*Did the Trial Court Lack Jurisdiction Over Landeo?*

Landeo raises one additional argument in his pro se appellate brief. He argues that because the State's complaint against him did not include an attached written statement, the Johnson County District Court lacked subject matter jurisdiction over him.

"The existence of subject matter jurisdiction cannot be waived, and its nonexistence may be challenged at any time. [Citation omitted]. A conviction obtained in a court without subject matter jurisdiction is void." *State v. Dunn*, 304 Kan. 773, 784, 375 P.3d 332 (2016).

Landeo argues that the trial court lacked jurisdiction over him because the State's complaint against him was defective. He argues that "'[c]harge' means a written statement presented to a court accusing a person of the commission of a crime and includes a complaint, information or indictment." He argues that the State's complaint against him lacked a "charge" and, therefore, he was held in custody without a "charge" in violation of his due process rights.

The State here correctly points out that Landeo's argument lacks merit. Since our Supreme Court issued its decision in *Dunn*, it has been well-settled law that "the Kansas Constitution—not charging documents—bestow subject matter jurisdiction on the courts." *State v. Sayler*, 306 Kan. 1279, 1283, 404 P.3d 333 (2017). Thus, "charging document sufficiency does not implicate state courts' subject matter jurisdiction in criminal cases." 306 Kan. at 1280.

Affirmed in part, sentences vacated, and remanded for resentencing.

* * *

GARDNER, J:  I respectfully dissent from the majority's ruling that the district court deprived Landeo of his right to counsel at sentencing. The record reflects that Landeo waived his right to counsel at sentencing by his conduct after the district court warned him about the consequences of continually forcing appointed counsel to withdraw. I agree with the majority on all other issues.

*The Sixth Amendment right to counsel is not unlimited*

A criminal defendant has a Sixth Amendment right to be represented by counsel at all critical stages of the proceedings, including sentencing. *Mempa v. Rhay*, 389 U.S. 128, 134, 88 S. Ct. 254, 19 L. Ed. 2d 336 (1967). But "[t]he Sixth Amendment right to choose one's own counsel is circumscribed in several important respects." *Wheat v. United States*, 486 U.S. 153, 159, 108 S. Ct. 1692, 100 L. Ed. 2d 140 (1988). The Sixth Amendment does not ensure that a defendant will be represented by the lawyer he prefers. 486 U.S. at 159. A defendant "has no right to an attorney who will docilely do as he is told." *United States v. Moore*, 706 F.2d 538, 540 (5th Cir. 1983). But Landeo consistently refused to abide by that principle—instead he insisted that each of his 10 appointed attorneys do exactly as he instructed. When they reasonably refused his frivolous or overreaching demands, Landeo manufactured conflicts or other issues with them and then forced them to withdraw so he could try to get his next appointed attorney to do his bidding.

*Landeo manipulated the process*

The district court repeatedly told Landeo that he had control over only three decisions in his case and that his attorney handles all other legal matters. See *State v. Rivera*, 277 Kan. 109, 116-17, 83 P.3d 169 (2004). Yet Landeo remained undeterred. Landeo's pattern was to dictate to his attorneys what arguments they were to raise, which documents they were to request, and the content of motions they were to file, among other matters. When counsel did not comply with Landeo's every whim, Landeo filed his own frivolous motions, repeatedly violating the district court's instruction that he not do so. He then filed or threatened to file ethics complaints or

51

subpoenas against his attorneys for not doing as he had directed them to do. This forced them to withdraw from the case.

The district court found that Landeo manufactured these issues with his counsel to delay the judicial process—to "thwart the process throughout this entire case to avoid a resolution of the matter." Yet Kansas cases establish that a defendant's right to counsel of choice "cannot be manipulated to impede the efficient administration of justice." *State v. Anthony*, 257 Kan. 1003, 1019-20, 898 P.2d 1109 (1995); see *State v. Robinson*, 303 Kan. 11, 85, 363 P.3d 875 (2015) (same), *disapproved of on other grounds by State v. Cheever*, 306 Kan. 760, 402 P.3d 1126 (2017); *State v. Bentley*, 218 Kan. 694, 695, 545 P.2d 183 (1976) ("Although an accused must be provided fair opportunity to obtain counsel of his choice, this right cannot be manipulated to impede the efficient administration of justice."). The same is true for appointed counsel. See generally *State v. Weigand*, 204 Kan. 666, 670, 466 P.2d 331 (1970) ("Delay in the enforcement of our criminal law should not be permitted or condoned."). Landeo manipulated his right to appointed counsel to impede the efficient administration of justice for almost four years before the district court finally found that Landeo had waived his right to counsel at sentencing by his conduct. The record abundantly supports the district court's finding that Landeo used his right to counsel as a tool to delay proceedings and impede justice.

*Defendants may waive the right to counsel by their conduct*

The Kansas Supreme Court has held that a defendant may waive the right to counsel by actions which contradict one's words, after being warned by the court. *State v. Buckland*, 245 Kan. 132, 137-39, 777 P.2d 745 (1989) (reversing Court of Appeals on that issue).

In *Buckland*, the defendant wanted to have a person who was not a licensed attorney represent him. Defendant insisted that he was not waiving his right to be represented by a lawyer, that he was not asking the court to appoint an attorney for him, and that he was not going pro se. Given that conundrum, the district court required Buckland to represent himself at trial. Buckland did so, got a hung jury and a mistrial, and then represented himself again at his second trial. He was convicted of one count of selling cocaine. The Court of Appeals held that the record

failed to show that Buckland had knowingly and intelligently waived his Sixth Amendment right to counsel, as does the majority here.

But the Supreme Court reversed, finding Buckland waived his right to counsel by his actions which contradicted his words after the court had properly warned him.

"The Court of Appeals appears to have based its decision on the fact the record did not reflect that Buckland understood his actions would result in a waiver of his right to counsel. At the time the trial court allowed Buckland's attorney to withdraw (June 13), the court informed Buckland that, if he had not obtained new counsel within the specified time frame, the court would assume that he was either proceeding pro se or that he would be filing an affidavit for appointment of counsel. At the July 9 hearing, the court again informed Buckland that the court would appoint counsel for him if he filed an affidavit. Buckland said he did not want counsel appointed, but he also stated that he was not waiving his right to be represented by an attorney. Although Buckland contended that he was not proceeding pro se, he told the court that he was withdrawing the motions previously made by his attorney and that he was filing motions on his own behalf.
        . . . .
"A review of the record shows that Buckland was uncooperative with the court and indicates that his refusal to obtain counsel may have been a delay tactic. . . . '[W]here the defendant will not voluntarily accept representation by counsel, the potential advantage of a lawyer's training and experience can be realized, if at all, only imperfectly. To force a lawyer on a defendant can only lead him to believe that the law contrives against him. Moreover, it is not inconceivable that in some rare instances, the defendant might in fact present his case more effectively by conducting his own defense.' *Faretta v. California*, 422 U.S. 806, 834, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975).
"The trial court adequately determined that Buckland knowingly and intelligently waived his right to counsel." 245 Kan. at 138-39.

Landeo, like the defendant in *Buckland*, was uncooperative with the court and his refusal to cooperate with counsel was a delay tactic. Although *Buckland* is factually distinguishable, we should find that Landeo knowingly and intelligently waived his right to counsel by his conduct. See *State v. McCormick*, 37 Kan. App. 2d 828, 836-39, 159 P.3d 194 (2007) (finding defendant's

53

conduct may be sufficient to constitute a knowing and voluntary waiver of the right to be represented by counsel).

Similar acts have often been found to establish a knowing and voluntary waiver of counsel. See, e.g., *United States v. Taylor*, 652 F.3d 905, 909 (8th Cir. 2011) ("[A] persistent, unreasonable demand for dismissal of counsel and appointment of new counsel . . . is the functional equivalent of a knowing and voluntary waiver of counsel. In such an instance, the trial court may proceed to trial with the defendant representing himself."); *United States v. Alden*, 527 F.3d 653, 660-61 (7th Cir. 2008) (finding that where district court gave defendant sufficient opportunity to retain assistance of appointed counsel, defendant's actions that have the effect of depriving himself of appointed counsel will establish a knowing and intentional choice); *United States v. Sutcliffe*, 505 F.3d 944, 955-56 (9th Cir. 2007) (finding defendant knowingly and intelligently waived his right to counsel through his conduct by his continued antagonism, sabotaging his relationships with his attorneys, and manipulative behavior after being told the risks of self-representation, the nature of the charges against him, and the penalties he faced); *United States v. Irorere*, 228 F.3d 816, 828 (7th Cir. 2000) (holding that when defendant's lack of counsel was caused by his own refusal to cooperate with appointed counsel and defendant was made aware of the possible consequences of his refusal to cooperate, the district court's decision to not appoint new counsel for the defendant does not constitute an abuse of discretion); *United States v. Harris*, 2 F.3d 1452, 1455 (7th Cir. 1993) (finding a voluntary and informed waiver when the defendant refused to cooperate with his lawyers and was told that no substitute counsel would be appointed for him); *United States v. Burson*, 952 F.2d 1196, 1198-99 (10th Cir. 1991) (finding waiver after seven months' battle over counsel, where no good cause had been shown for dissatisfaction with current counsel); *United States v. Gallop*, 838 F.2d 105, 109-11 (4th Cir. 1988) (finding refusal to proceed with able appointed counsel without good cause is a knowing, voluntary waiver); *United States v. Sarsoun*, 834 F.2d 1358, 1363 (7th Cir. 1987) (holding failure to cooperate with court creates an implied waiver of right to counsel); *United States v. Moore*, 706 F.3d 538, 540 (5th Cir. 1983) (holding that a persistent, unreasonable demand for dismissal of counsel and appointment of new counsel may be the functional equivalent of a knowing and voluntary waiver of counsel); *United States v. Gipson*, 693 F.2d 109, 112 (10th Cir. 1982) (finding defendant's delaying tactics of unreasonably refusing competent counsel could

constitute waiver of counsel), *overruled by United States v. Allen*, 895 F.2d 1577 (10th Cir. 1990); *United States v. Henderson*, No. 98-5216, 1999 WL 313842, at \*2 (6th Cir. 1999) (unpublished opinion) (finding valid waiver by conduct where defendant was unwilling to accept the consistent advice of two experienced criminal defense attorneys appointed to represent him and nothing in the record contradicted the district court's judgment that defendant was engaging in a delaying tactic for no good reason).

*Landeo was adequately warned*

The focal issue is whether the district court adequately warned Landeo that his future conduct would be deemed a choice to represent himself. A district court need not slavishly recite each of the recommended warnings, as we have found:

"Although all of the recommended advisories of *Buckland* and *Daniels* may not have been administered to Hernandez, we conclude that the record reflects that the requirements of these cases were fulfilled and that Hernandez appreciated the charges, the potential punishments, and the consequences of waiving counsel. He may have been confused as to some technical aspects of the proceedings, but a defendant's technical legal knowledge or lack thereof is not relevant to an assessment of his or her knowing exercise of the right to defend himself or herself. *Faretta v. California*, 422 U.S. 806, 835-36, 45 L. Ed. 2d 562, 95 S. Ct. 2525 (1975). Hernandez was informed of his right to counsel on several occasions and consistently refused such assistance. Moreover, Hernandez was provided with advisory counsel, which mitigates any risk of an unfair trial. See *State v. Mixon*, 27 Kan. App. 2d 49, 52, 998 P.2d 519, *rev. denied* 269 Kan. 938 (2000). We embrace the full advisories set forth in *Buckland* and *Daniels* as the better practice, but the failure to administer all such advisories here was not reversible error. Hernandez made a knowing and voluntary waiver of counsel." *State v. Hernandez*, No. 93,185, 2006 WL 2043000, at \*3 (Kan. App. 2006) (unpublished opinion) (finding the district court adequately informed defendant before allowing him to waive his right to counsel and proceed pro se at trial).

The record shows that the district court followed the advisories set forth in *Buckland* and *State v. Daniels*, 2 Kan. App. 2d 603, 586 P.2d 50 (1978), making Landeo aware of his right to

55

counsel and of the possible consequences of his decision to force counsel to withdraw. First, it is undisputed that Landeo was adequately informed of the right to counsel and the right to appointment of counsel. Landeo's knowledge is demonstrated by his frequent exercise of his right to appointment of counsel.

Second, Landeo possesses the intelligence and capacity to appreciate the consequences of a waiver. "'[W]hether there was such must depend upon the particular facts and circumstances, including background, experience, and conduct of the accused.'" *State v. Andrews*, 5 Kan. App. 2d 678, 679, 623 P.2d 534 (1981). Landeo does not contend that he is uneducated or lacks either intelligence or capacity. The district court found Landeo's ability to represent himself was evident from his statements in court and his writings and that he had "a better grasp on the law than other nonlawyers." The record includes many clear and understandable motions filed by Landeo and shows that he possessed enough intelligence and capacity to appreciate the consequences of his acts. See *State v. Kennedy*, No. 112,919, 2015 WL 4588199, at *3-5 (Kan. App. 2015) (unpublished opinion) (upholding waiver, finding the record sufficient to show that defendant knew what she was doing and made her choice with her eyes open). The district court found that Landeo had the ability to represent himself:

> "[Y]ou have demonstrated from both your filings with the Court, handwritten *pro se* motions both while represented and while unrepresented, as well as your arguments in Court that I think that you have the ability and you wish to have the right to handle this matter yourself and that you want to be able to assert these defenses and take these various paths in attacking the evidence against you. That is your right, and you have put yourself into this box."

Third, the record shows that Landeo understood the nature of the charges and proceedings before and during sentencing. His understanding is shown by the vigorous manner in which he participated in the pretrial, trial, and sentencing proceedings. He filed at least 24 motions before trial, 6 motions after trial and before sentencing, and argued at length at sentencing before the district court had security officers remove him from the courtroom for his "continuous outbursts." And at sentencing, because Landeo was convicted of off-grid crimes and

56

because no request for restitution was made, there was nothing much for him to contest, including his criminal history or other information in the presentence information report.

Landeo's waiver was not unknowing. He was not mentally ill, he understood the nature of the charges against him, and he was aware of the possible penalties he faced upon conviction. He had stand-by counsel at sentencing so had the opportunity to consult with experienced trial counsel. He was not pressured into waiving his right to counsel at sentencing—rather, Toth was removed at Landeo's request. Landeo understood courtroom rules and procedures well enough to participate actively in his defense at sentencing. His repeated attempts to continue his trial and sentencing by dismissing his counsel show manipulation or intentional delay, implying a greater understanding of the proceedings and an understanding of the risks and complexities of the criminal process. His choice to force Toth to withdraw was nothing but a calculated, voluntary exercise of his informed free will, cf. *Faretta v. California*, 422 U.S. 806, 835, 95 S. Ct. 2525, L. Ed. 2d 562 (1975), rather than the result of a mistaken or uninformed decision.

Fourth, the district court exhaustively informed Landeo of the dangers and disadvantages of self-representation. At a pretrial hearing on Landeo's speedy trial motion in December 2015, the district court told Landeo that he had waived his right to counsel by his conduct over the past two-and-one-half years. The district court told Landeo that he had caused undue delay based on his belief that he could handle his defense better than any of his appointed attorneys, and had thus chosen to represent himself. The district court then warned Landeo about representing himself, including the following:

- It's not a good idea to represent yourself because you do not have any legal training. This puts you at a distinct disadvantage.
- The matters you are facing are serious and have lasting repercussions which require experienced counsel to defend.
- The court will not appoint another counsel but will appoint standby counsel, and the limits of that role.
- No last-minute postponement of trial will be allowed for new counsel.

57

- Counsel, not Landeo, is to determine what motions to file.
- You must follow all applicable legal rules.
- Your understanding of legal terms may impede your communications.
- The court will not act on your behalf in making objections or motions and you may miss objections.
- You will be held to the standard of an attorney, including objections, motions, rules of law, and foundational issues.
- You may waive constitutional or other rights without being aware of it.
- It will be difficult for you to locate, interview, subpoena, and serve witnesses since you are in custody.
- You are charged with off-grid felonies and could be imprisoned on each count for up to 25 years without parole.

The district court changed its mind within two weeks, however, for reasons unstated in the record, and appointed yet another counsel to represent Landeo.

*Landeo's purported lack of understanding is not credible*

At times Landeo protested that he did not understand the court's warnings or its conclusion that he had chosen to represent himself. But the district court found those protestations not credible:

> "I believe you understand exactly what we're talking about here, that you have made a waiver of your right to have counsel represent you, that you are aware you have a level of intelligence that's been demonstrated both in your writing and in your verbal statements here in Court that you wish to pursue this case despite your protestations that you need an attorney and that you have the right to counsel that you've waived that by your action over two and a half years."

Granted, the district court made this finding around two years before Landeo went pro se at sentencing, but nothing in the record shows any change in the district court's assessment of Landeo's credibility or intelligence during the intervening one-and-one-half years. We cannot challenge that credibility call. *State v. Lowery*, 308 Kan. 1183, 1236, 427 P.3d 865 (2018).

Similarly, the district court gave little credence to Landeo's statements that he wanted counsel to represent him.

> "It may be an exercise in futility to appoint another attorney because this repeated record that you have makes [it self-evident] that you want to direct things. If that's the case, you will be granted the right to represent yourself in this matter . . . .
> "And if, as I think that we covered the fact of [your attorney] is in charge of handling the lawyer portion in representing you and given this fact of where we're at, the same transactions happening, same issues coming up, your argument of what you think your attorneys are not doing for you, that will only leave it to me to find that you want to represent yourself, even though you're saying you don't want to.
> > "Even though you're saying you want an attorney to represent you, you fail to follow the rules that have been stated to you as to what the attorney does and what rights you have. Because you have a disconnect in what you think an attorney is supposed to do for you that is appointed."

*Landeo's expressed desire for counsel is irrelevant*

It makes no difference that Landeo repeatedly asserted that he wanted counsel and did not want to represent himself—waiver by conduct does not depend on one's expressed desires.

> "[Defendant's] continued desire for counsel, however, is irrelevant. As this court has stated previously, waiver by conduct nonetheless may apply, 'regardless of whether the defendant affirmatively wishes to part with that right.' *Goldberg*, 67 F.3d at 1101 (describing waiver by conduct despite defendants 'vehement[ ] object[ions] to being forced to proceed *pro se*')." *United States v. Thomas*, 357 F.3d 357, 363 (3d Cir. 2004).

59

So Landeo's stated desire for counsel is irrelevant. "Suffice it to say that the Court has approved a trial court's decision to deprive a defendant of a fundamental constitutional right at least where the defendant is aware of the consequences of his actions, but regardless of whether the defendant affirmatively wishes to part with that right." *United States v. Goldberg*, 67 F.3d 1092, 1101 (3d Cir. 1995).

This case is much like *United States v. Fazzini*, 871 F.2d 635 (7th Cir. 1989), where the defendant waived his right to counsel at sentencing by his conduct, even though he said he wanted an attorney. There, the defendant claimed that he did not knowingly and intentionally waive his right to appointed counsel since he continued to ask for counsel even after his counsel was excused from the case. The court found that a verbal waiver was unnecessary:

> "Yet it is not necessary that a defendant verbally waive his right to counsel; so long as the district court has given the defendant sufficient opportunity to retain the assistance of appointed counsel, defendant's actions which have the effect of depriving himself of appointed counsel will establish a knowing and intentional choice. *Wilks*, 627 F.2d at 35-36; *United States v. Moore,* 706 F.2d 538, 539 (5th Cir.), *cert. denied*, 464 U.S. 859, 104 S. Ct. 183, 78 L. Ed. 2d 163 (1983)." *Fazzini*, 871 F.2d at 642.

Here, as in *Fazzini*, the district court gave the defendant sufficient opportunity to keep his appointed counsel, but defendant chose to create conflicts or other reasons to force them to withdraw, establishing a knowing and intentional choice.

Similarly, in *Moore*, 706 F.2d at 540, the court found the defendant waived his right to counsel by his conduct. There, the trial court appointed and the defendant rejected "several attorneys." 706 F.2d at 539. After appointing the defendant's third attorney, the judge warned him that failure to cooperate with the fourth appointed attorney would signal a waiver of the right to counsel. Right before trial, the defendant moved to have new counsel appointed because he could not get along with counsel. The court refused to appoint new counsel, found that the defendant had waived his right to counsel, and appointed the fourth to act as stand-by counsel during trial. After his conviction, the defendant appealed, claiming that the district court denied him his right to counsel.

60

The Fifth Circuit rejected that claim.

"That demand is precisely the issue herein presented: may a defendant repeatedly demand that his appointed counsel be relieved and that new counsel be appointed and, if the request is denied, contend that his sixth amendment right to counsel, echoed in Rule 44 of the Federal Rules of Criminal Procedure, has been violated? We answer that inquiry in the negative.

"We conclude that a persistent, unreasonable demand for dismissal of counsel and appointment of new counsel, as herein discussed, is the functional equivalent of a knowing and voluntary waiver of counsel. In such an instance the trial court may proceed to trial with the defendant representing himself. When that occurs, the preferred practice directs the trial court to offer the assistance of standby counsel, as was done in the case at bar." *Moore*, 706 F.2d at 540.

In *Moore,* as here, the defendant insisted that he was not waiving his right to appointed counsel. Yet the court found otherwise. We should do the same based on Landeo's persistent, unreasonable, repeated demands for dismissal of counsel and appointment of new counsel.

Landeo cannot simultaneously refuse appointed counsel and decline self-representation, creating a safe haven from criminal proceedings.

"We note that the judicial obligation to warn against self-representation does not empower the defendant to halt the judicial process by simultaneously refusing appointed counsel and declining self-representation. A defendant's refusal to accept one of those options does not create a safe haven from criminal proceedings. Rather, after informing a defendant of the dangers of self-representation, the court can treat a subsequent refusal to accept appointed counsel as the functional equivalent of a knowing and voluntary waiver of counsel. The trial can then commence, with the defendant representing himself with the assistance of stand-by counsel. *See United States v. Moore*, 706 F.2d 538, 540 (5th Cir. 1983)." *United States v. Clemons*, No. 97-6267, 1999 WL 196568, at *5 (6th Cir. 1999) (unpublished opinion).

61

The district court followed this procedure here. It informed Landeo of the dangers of self-representation then treated his later refusal to continue with appointed attorney Toth as the functional equivalent of a knowing and voluntary waiver of counsel. It appointed Toth as stand-by counsel to assist Landeo during the sentencing hearing, and Landeo does not challenge that appointment on appeal. Landeo thus gained the control he had long sought while retaining any legal expertise he desired. Under the circumstances, no more is legally required.

*The remoteness of the court's warnings is not determinative*

The majority is properly concerned that the district court's warnings were not close to the date Landeo fired Toth. The court's most thorough warnings to Landeo were in December 2015, yet the district court, in the exercise of extreme patience penalized by the majority, did not find a waiver until June 2017. But the timing is not crucial. The law does not require that the warning be timed to directly or even closely precede the relevant misconduct. *State v. Afeworki*, 189 Wash. App. 327, 346, 358 P.3d 1186 (2015). That would require the district court to be a prognosticator.

> "'[T]o the extent that the defendant's actions are examined under the doctrine of "waiver," there can be no valid waiver of the Sixth Amendment right to counsel unless the defendant also receives *Faretta* warnings.' *Goldberg*, 67 F.3d 1100. However, the warning need only precede the conduct that eventually gives rise to the waiver. There is no requirement that it be timed (somehow) to directly—or even closely—precede the relevant misconduct. *Thomas*, 357 F.3d at 363. As explained in one of the seminal cases discussing the issue,
>
>> "[the] suggestion that the District Court should have timed the [*pro se* ] colloquy on the eve of counsel's motion to withdraw is a novel one unsupported by case law. The purpose of a [*pro se* ] colloquy is to provide the defendant with notice that continued misconduct may result in the waiver of one's right to counsel; thus, we focus on whether [the defendant] was warned of the possible consequences, not whether the warning immediately preceded the District Court's order that the defendant must proceed *pro se*.
>
> "*Thomas*, 357 F.3d at 363 (citation omitted)." *Afeworki*, 189 Wash. App. at 346-47.

Granted, an 18-month gap is a long time, but Landeo received intervening warnings about his conduct, and nothing suggests the district court's 2015 warnings were forgotten or diluted with the passage of time. In fact, the record supports the opposite inference—it shows that Landeo took the district court's warnings to heart and understood that he would be a fool to represent himself. That is why he consistently chose instead, during the intervening months, to try to manipulate even more appointed counsel to do his bidding.

But we need not rely on the efficacy or timing of the December 2015 warnings. Toth explicitly warned Landeo in writing two weeks before his sentencing hearing what the consequences of his acts would be. When Landeo forced Toth to withdraw, the court held a hearing immediately before Landeo's sentencing hearing on June 30, 2017. Toth told the court he had received a letter from Landeo around June 17, demanding that he withdraw as counsel. Toth responded by letter informing Landeo:

- Toth was not going to work on Landeo's case anymore;
- The court could:
    1) appoint Landeo new counsel; or
    2) make Landeo argue sentencing on his own without presence of any counsel or standby counsel; and
- Toth would possibly serve as standby counsel to answer any questions for Landeo.

Landeo was thus presented with a clear, binary choice immediately before he forced Toth to withdraw.

Landeo was present at the hearing on Toth's motion to withdraw when Toth explained this letter in detail to the district court. So Landeo not only received Toth's letter but also heard just before his sentencing hearing the potential consequences of his acts in forcing Toth to withdraw. Even if he thought the district court might appoint him yet another counsel, he knew the district court could find that he had chosen to represent himself. He took that risk with his

63

eyes open, having been warned by the court previously and from his own attorney recently of the dangers that lay ahead. The State thus met its burden to show Landeo was advised of his right to counsel and that his waiver was knowingly and intelligently made. See *State v. Neal*, 292 Kan. 625, 633-34, 258 P.3d 365 (2011).

*The purpose of warnings is met*

Warnings are not an end in themselves but are a means to the end of ensuring that defendants do not waive fundamental constitutional rights without an adequate understanding of the consequences of their choices. *Jones v. Walker*, 540 F.3d 1277, 1293 (11th Cir. 2008). "So long as a defendant knows the risks associated with self-representation, it is irrelevant for constitutional purposes whether his understanding comes from a colloquy with the trial court, a conversation with his counsel, or his own research or experience." 540 F.3d at 1293. The "ultimate test" of whether a defendant's choice is knowing is not the adequacy of the trial court's warning but the extent of the defendant's understanding. *Fitzpatrick v. Wainwright*, 800 F.2d 1057, 1065-67 (11th Cir. 1986) (finding that although the colloquies between the judge, the prosecutor, and the defendant did not expressly address defendant's understanding of the risks of self-representation, defendant understood those risks, satisfying the Sixth Amendment). "The core inquiry is whether the defendant understood the choices before him and the potential dangers of proceeding *pro se*. If so, his waiver is valid." *Jones*, 540 F.3d at 1289. The facts of record show Landeo understood his choices and the potential dangers of going pro se.

By knowingly forcing his 10th appointed counsel to withdraw immediately before his sentencing hearing, Landeo chose to proceed pro se at sentencing as surely as if he had made an affirmative request to do so, thereby voluntarily waiving his right to counsel by his conduct. See *Jones*, 540 F.3d at 1289. The district court showed concern for Landeo's right to counsel and remarkable patience with a contumacious litigant. But it understood that "there must be some limit to the defendant's ability to manipulate the judicial system." *Gallop*, 838 F.2d at 110. Even though a comprehensive and probing inquiry at Landeo's sentencing hearing into the knowingness and intelligence of Landeo's waiver would have been best, the circumstances as a

whole establish that Landeo intelligently, knowingly, and voluntarily waived his right to counsel by his conduct. I would affirm on all issues.